**Henry H. AMSDEN, et al.,
Plaintiffs, Appellants,**

v.

**Thomas F. MORAN, etc., et al.,
Defendants, Appellees.**

**No. 90–1015.**

United States Court of Appeals,
First Circuit.

Heard April 5, 1990.

Decided May 29, 1990.

SELYA, Circuit Judge.

Henry H. Amsden, a land surveyor, sued the New Hampshire Board of Land Surveyors (BLS) and its individual members in New Hampshire's federal district court. Invoking 42 U.S.C. § 1983 (1982) and seeking damages totaling $2,500,000, Amsden accused defendants of scorning his right to due process.[1] Confronted with cross motions for summary judgment, the district court granted *brevis* disposition in defendants' favor on the basis of qualified immunity. Amsden appeals. We affirm.

## I. THE LAY OF THE LAND

We begin with an overview of the regulatory mosaic and then proceed to rehearse the facts in the light most congenial to the summary judgment loser, as Fed.R.Civ.P. 56 requires. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir.1989).

### A. *Regulatory Framework.*

The BLS is a state regulatory authority whose members are appointed by the governor.[2] It is empowered to determine and set standards of admission to the practice of land surveying; to promulgate rules anent licensure; and to adopt ethical and professional guidelines. *See generally* N.H. Rev.Stat.Ann. §§ 310–A:53 to 310–A:69 (1984). The BLS may institute disciplinary proceedings against licensed land surveyors on its own initiative or upon written complaint. *See* N.H.Rev.Stat.Ann. §§ 310–A:70(I), 310–A:71. Where "misconduct" has been found, the BLS may impose a variety of sanctions, ranging from reprimand to revocation of the surveyor's li-

Glenn R. Milner with whom Cook & Molan, P.A., was on brief, for plaintiffs, appellants.

Charles T. Putnam, Asst. Atty. Gen., with whom John P. Arnold, Atty. Gen., was on brief, for defendants, appellees.

Before BREYER, Chief Judge, and CAMPBELL and SELYA, Circuit Judges.

---

1. Suit was brought not only by Amsden but also by his wholly-owned surveying firm, H.H. Amsden & Sons. The firm's claims were purely derivative of, and dependent upon, Amsden's claims. The district court entered summary judgment against both plaintiffs. Amsden has neither briefed nor argued any separate entitlement on the company's account. For simplicity's sake, we treat the case as if Amsden were the sole plaintiff-appellant, but our resolution is, of course, equally binding upon the firm.

2. The BLS's operating charter has recently been amended by the state legislature. *See, e.g.,* N.H. Rev.Stat.Ann. §§ 310–A:53, 310–A:54, 310–A:55, 310–A:63, 310–A:67, 310–A:68, 310–A:74 (Supp. 1989). Because these amendments were not effective until well after the present die was cast, we refer exclusively to the contemporaneous version of the enabling legislation except where the contrary is specifically indicated.

cense. *See* N.H.Rev.Stat.Ann. §§ 310–A:70(II), (III). Disciplinary proceedings are first heard by the BLS and are thereafter eligible for rehearing by the BLS and, if need be, direct judicial review by the New Hampshire Supreme Court. *See* N.H.Rev.Stat.Ann. § 310–A:71; N.H.Rev.Stat.Ann. § 541:6 (1974). Proceedings before the BLS are also subject to collateral review by the state Board of Claims (BOC). *See* N.H.Rev.Stat.Ann. § 541–B:2 (Supp.1989); 1977 N.H.Pub.L. 595:2 (formerly codified at N.H.Rev.Stat.Ann. § 541–B:9). At the times material hereto the BOC had exclusive jurisdiction over all damage claims against state agencies; no award could exceed $50,000. *See id.;* 1977 N.H.Pub.L. 595:2 (formerly codified at N.H.Rev.Stat. Ann. § 541–B:14). BOC decisions are now, and were then, subject to discretionary review by the New Hampshire Supreme Court. N.H.Rev.Stat.Ann. § 541–B:10(IV) (Supp.1989); N.H.Rev.Stat.Ann. § 541:6 (1974).

## B.  *Facts and Travel.*

Amsden was licensed as a land surveyor in 1969. Six years later, he became associated with Tyrone Hunter, an unlicensed (but practicing) land surveyor. Such an association was not uncommon; like apprenticeships in other fields, the praxis allowed newcomers to the profession to gain supervised experience.

In 1977, the Amsden–Hunter duo was hired to survey a 40–acre parcel owned by Mr. and Mrs. Whipple. The tract then became embroiled in a boundary dispute. Deferring their topographic work, Amsden and Hunter assisted the Whipples in the ensuing litigation. By late 1981, however, the surveyor-client relationship had soured. The Whipples filed a complaint with the BLS against their two former geodesists. On December 29, Amsden was notified of the complaint and advised that a hearing would take place on January 15, 1982. The notification letter specified three charges to be considered: misrepresentation of qualifications; overcharging; and delayed completion of work.

We will not attempt to inventory every session or to deliver a blow-by-blow account of what transpired administratively. We list instead certain highlights (or as plaintiff sees it, lowlights) of the proceedings:

1. According to plaintiff, when the hearings were convened, the BLS "declined to consider the question of the reasonableness of the fee billed" to the Whipples, citing jurisdictional problems.

2. In the spring of 1982, before conducting the last of the hearings, BLS members visited the Whipple property. Amsden—who was present at, and participated in, all of the sessions—was not notified of the field trip.

3. When the hearings concluded, the BLS reserved decision.

4. In March 1983, while the Whipple matter was still under advisement, the BLS received a complaint from two land surveyors who protested that Hunter was holding himself out, falsely, as a licensed land surveyor. The BLS, through its chair, responded that it could take no action because it lacked jurisdiction over unlicensed persons. *See* N.H.Rev.Stat.Ann. §§ 310–A:72, 310–A:73.

5. The next month—in what Amsden sees as tergiversation or worse—the BLS wrote to the Land Surveyors Association proposing a meeting at which all of the material against Hunter could be assembled and discussed, and a strategy planned.

6. On May 1, 1983, the BLS finally acted on the Whipples' complaint, revoking Amsden's license. The BLS justified its order by finding that Amsden had "failed to exercise adequate supervision or checking over Mr. Hunter, had produced a fraudulent [survey] plan and had acquiesced in the charging of fees which were exorbitant."

7. Amsden then hired a new attorney, Richard Upton. The lawyer informed the BLS that Amsden had dissolved his professional relationship with Hunter. On May 11, Upton secured an agreement to postpone the effective date of the revocation order. He proceeded to negotiate a settle-

ment whereby Amsden returned roughly 60% of the overall fee to the Whipples.

8. Once his dispute with the Whipples was settled, Amsden asked the BLS to take a fresh look at its earlier order. The BLS did so. "Upon consideration of the motion for rehearing and the evidence in support thereof," it withdrew the revocation on July 1, 1983, restored Amsden's license unconditionally, and warned him to oversee unlicensed surveyors more carefully in the future. Amsden and Hunter parted company, although it remains unclear whether the BLS required the separation as a condition precedent to returning Amsden's license. Amsden elected not to seek direct appellate review of the final BLS action.

The calm was short-lived. In January 1984, Amsden filed an action before the BOC, alleging various due process deprivations and state-law torts. He sought damages for loss of business and injury to professional reputation. Amsden argued among other things that the BLS decided the case against him not on the basis of his conduct, but as a device to force Amsden to abandon his arrangement with Hunter, thereby putting Hunter out of the land surveying business. Amsden also claimed that the license revocation was motivated by the chair's animosity toward him and that certain statements anent the revocation amounted to slander.

The BOC, though rejecting outright the claims of animus and defamation, took issue with the BLS's findings that the survey plan was "fraudulent" and the fees "exorbitant." The BOC also concluded that the BLS had "revoked Amsden's license because it wanted to put Hunter out of business by severing his relationship with Amsden." Nevertheless, the BOC determined that Amsden had properly been haled before the BLS and that the BLS's actions did not fall clearly beyond its jurisdiction. Because the BOC believed that the BLS was entitled to absolute immunity for quasi-judicial acts within the ambit of its ostensible authority, damages were denied. Both parties appealed to the state supreme court, which refused review in June 1986.

Almost two years later, plaintiff filed suit in federal district court. He again alleged that the BLS had violated his due process rights (procedural and substantive) and sought a monetary balm. Without answering the absolute immunity question, the district court ruled that the defendants were at least entitled to, and shielded from liability by, qualified immunity. In addition, the district court ruled that plaintiff's claims against the defendants in their official capacities were barred by the Eleventh Amendment and *Will v. Michigan Dep't of State Police*, —— U.S. ——, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989).[3]

## II. CERTAIN LEGAL LANDMARKS

Prefatory to our main discussion, we stake out the perimeters of the doctrine of qualified immunity and the junction where that doctrine and Fed.R.Civ.P. 56 intersect.

### A. *Qualified Immunity.*

Qualified immunity shields government officials wielding discretionary powers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Whether a defendant actually infracted a plaintiff's rights is not the central issue: "Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard." *Davis v. Scherer*, 468 U.S. 183, 190, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). The "applicable standard" is an objective one. Thus:

Because qualified immunity does not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity.

We need not, therefore, address the issue.

**3.** Plaintiff has not assigned error to this holding.

*Collins v. Marina–Martinez,* 894 F.2d 474, 478 (1st Cir.1990); *accord Brennan v. Hendrigan,* 888 F.2d 189, 194 (1st Cir. 1989); *Newman v. Commonwealth of Massachusetts,* 884 F.2d 19, 26 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990); *cf. Unwin v. Campbell,* 863 F.2d 124, 133 n. 9 (1st Cir. 1988) (where defendants have winning position on merits, and merits and qualified immunity are intertwined, defendants are not disabled from pursuing and prevailing on interlocutory appeal).

The qualified immunity inquiry logically begins with identification of the right at issue and proceeds to place that right in historical perspective. If the right allegedly violated was "clearly established" when the challenged conduct took place, then the defendants should reasonably have been cognizant of it. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. In this context, the phrase "clearly established" has a special definition: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

■ In the case before us, the establishment hurdle is easily vaulted. Where persons are deprived of property interests, it has long been "clearly established" that due process safeguards must be afforded. *See, e.g., Paul v. Davis,* 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Defendants wisely concede that the revocation of plaintiff's land surveying license constituted deprivation of a property interest sufficient to animate due process protections. Accordingly, we assume for purposes of analysis that plaintiff's entitlement to due process was "clearly established." *See Chongris v. Board of Appeals,* 811 F.2d 36, 40 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987); *Cloutier v. Town of Epping,* 714 F.2d 1184, 1191 (1st Cir.1983).

■ After the complainant's "clearly established" rights have been ascertained, a reviewing court must evaluate the defendants' actions in light thereof. *See Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039; *Sullivan v. Carrick,* 888 F.2d 1, 3 (1st Cir.1989). That is to say, we must determine whether defendants reasonably should have comprehended that their specific actions transgressed those "clearly established" rights. *See Newman,* 884 F.2d at 23.

### B. *Summary Judgment.*

From time to time, early resolution of qualified immunity questions can create strange procedural configurations. *See, e.g., Domegan v. Fair,* 859 F.2d 1059, 1061–62 (1st Cir.1988) (discussing restrictions on appellate jurisdiction when an interlocutory appeal raises a qualified immunity issue). Substantively, however, the usual Rule 56 criteria are undisturbed. Where a qualified immunity defense is advanced by pretrial motion, "normal summary judgment standards" control. *Rogers v. Fair,* 902 F.2d 140, 142 (1st Cir.1990); *see also Unwin,* 863 F.2d at 132. Hence, summary judgment is proper only if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

■ Because granting summary judgment necessarily involves applying a legal standard to facts which must by definition be undisputed, appellate review of the district court's order is plenary. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990); *Quaker State,* 884 F.2d at 1513 (1st Cir.1989). Thus, we are obliged to examine the properly documented portions of the record and draw all reasonable inferences therefrom in the light most hospitable to the party opposing the motion. *See Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Garside,* 895 F.2d at 48.[4] It follows that,

4. Appellant complains that the district court misaligned the burdens on summary judgment by

in a case postured like the present one, we must credit the plaintiff's version of defendants' actions to the extent that plaintiff has appropriately supported his version. *See Domegan*, 859 F.2d at 1064. If, viewed in this way, "we find that issues of fact which were adequately raised below need to be resolved before the related legal issues can be decided," *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989), or if we believe the district court erred in expounding the law, we must reverse.

## III. BOUNDARIES OF DUE PROCESS

We now arrive at the crux of the matter: determining, consistent with the rigors of Rule 56 and the limiting principle of qualified immunity, whether defendants reasonably should have known that the processes afforded Amsden were constitutionally infirm. Appellant claims that the Fourteenth Amendment was abridged both procedurally and substantively, so we must explore two trails. But, because the geography of due process is hilly, and its taxonomy freighted with ambiguity, we first elucidate some differences which distinguish "procedural" due process from "substantive" due process. We then survey Amsden's claims.

### A. *The Dichotomy.*

■ The essentials of procedural due process comprise notice of the charges and a reasonable chance to meet them. *See Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976); *Collins*, 894 F.2d at 480. The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). As the rubric itself implies, "procedural due process" is simply "a guarantee

of fair procedure." *Zinermon v. Burch,* — U.S. ——, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

There is no mechanical formula by which the adequacy of state procedures can be determined. To the contrary, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Courts thus conduct their tamisage according to a sliding scale, balancing a number of factors, including the nature of the private and public interests involved; the risk of erroneous deprivation accruing under the procedures used by the state; and the probable benefit of demanding additional procedural safeguards. *See Mathews*, 424 U.S. at 335, 96 S.Ct. at 903; *Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600; *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 17–18, 98 S.Ct. 1554, 1564–1565, 56 L.Ed.2d 30 (1978). When a procedural due process claim is advanced, the proper focus must be on the manner in which the state has acted: "how and when" the alleged deprivation was effected. *See Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979); *see also Zinermon*, 110 S.Ct. at 983. Whether the deprivation (*e.g.*, license revocation) was itself erroneous is beside the procedural due process point. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978).

■ In contrast, a substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible. Stating the proposition does not cabin it very well. It has been said, for instance, that substantive due process protects individuals against state actions which are "arbitrary and capricious," *Newman*, 884 F.2d

---

ruling that he was obliged "to demonstrate that it was clearly established that [defendants] could not discipline Amsden for the reasons [that they] did." Because our review is de novo, we need not dwell upon whether the quoted

statement revealed some error by the district court. *Cf., e.g., Garside*, 895 F.2d at 48–49 ("in appraising summary judgments … a court of appeals is not wedded to the district court's reasoning").

at 25,[5] or those which run counter to "the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), or those which, in context, appear "shocking or violative of universal standards of decency," *Furtado v. Bishop,* 604 F.2d 80, 95 (1st Cir.1979) (footnote omitted), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (in substantive terms, Due Process Clause condemns conduct "too close to the rack and the screw"); *cf. Tenoco Oil Co. v. Department of Consumer Affairs,* 876 F.2d 1013, 1020–24 (1st Cir.1989) (discussing disfavored status of substantive due process claims).

We decline the invitation to sort out so wide a variety of labels. Wordplay aside, we agree with Judge Friendly that, in the circumscribed precincts patrolled by substantive due process, it is only when some basic and fundamental principle has been transgressed that "the constitutional line has been crossed." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). As distinguished from its procedural cousin, then, a substantive due process inquiry focuses on "what" the government has done, as opposed to "how and when" the government did it. And although the yardstick against which substantive due process violations are measured has been characterized in various ways, we are satisfied that, before a constitutional infringement occurs, state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking.

### B. *Procedural Due Process.*

With this brief prelude, we turn to appellant's procedural due process claim. The interests involved are not much in doubt. Plaintiff's licensure directly affects his ability to earn a livelihood and is therefore a matter of considerable concern. By the same token, the public interest in ensuring standards, accountability, and professional competence cannot seriously be questioned. Given the balance of interests, our inquiry perforce centers around the fairness of the protocol which was employed and the risks of a lasting (erroneous) deprivation.

Appellant devotes the bulk of his argument to an unremitting attack on the procedural obstacles which the BLS supposedly placed in his path, contending that these obstacles reduced the hearings to a meaningless formality. He complains, for example, that the BLS prevented him from mounting a defense by not telling him that his relationship with Hunter was the focal point of the BLS's concern. He takes similar umbrage at the findings of fraud and inadequate supervision, asserting that, because of their tenuous bearing on the accusations contained in the notification letter, he had no fair chance to address the issues. He likewise complains that the BLS, after disclaiming jurisdiction over the reasonableness of fees, sandbagged him by considering the subject. Last but not least, he rails mightily against the glimpse of the Whipple property which was taken in his absence.

We must start somewhere in our effort to leaf through this gallimaufry of charges. The gravamen of plaintiff's argument appears to hinge upon whether he was deprived of proper notice. In plaintiff's view, the BLS revoked his license not to sanction his misconduct but to force him to jettison Hunter, thereby putting the latter out of the surveying business. Because the BLS acted surreptitiously, masking its true concern, plaintiff argues that he could not effectively defend himself.

---

5. Though in common parlance the phrase "arbitrary and capricious" may indicate an absolute lack of rationality not susceptible to adjectives of degree, its legal usages are decidedly otherwise. *See, e.g., Sierra Club v. Secretary of the Army,* 820 F.2d 513, 517 & n. 4 (1st Cir.1987); *Federal Election Comm'n v. Rose,* 806 F.2d 1081, 1088–89 (D.C.Cir.1986). In the substantive due process context, the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error. Further precision eludes us. Like procedural due process, substantive due process "varies with the subject-matter and necessities of the situation." *See Moyer v. Peabody,* 212 U.S. 78, 84, 29 S.Ct. 235, 236, 53 L.Ed. 410 (1909).

We believe that Amsden relies on too isthmian an idea of how procedural due process regimens are to be evaluated. When a complainant alleges violations of procedural due process and asserts that those violations are cognizable under section 1983, the existence of state remedies becomes highly relevant. *Zinermon,* 110 S.Ct. at 983. A reviewing court must therefore examine "the procedural safeguards built into the statutory or administrative procedure ... effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Id.* The availability of judicial review is an especially salient consideration in situations where permits and licenses have been denied or revoked by state or local authorities in alleged derogation of procedural due process. *See, e.g., Cloutier,* 714 F.2d at 1192; *Roy v. City of Augusta,* 712 F.2d 1517, 1523 (1st Cir.1983).

We briefly describe the available process. New Hampshire afforded direct judicial review of the BLS's determination. *See* N.H. Rev.Stat.Ann. § 310–A:71 (1984); N.H.Rev. Stat.Ann. § 541:6 (1974). For his part, however, Amsden found it unnecessary even to enter upon, let alone travel the entire length of, that road. Through his attorney, Amsden was given timely access to the BLS for the avowed purpose of administrative reconsideration. Although the negotiations which followed the rehearing request appear to have been undertaken informally, they were unquestionably part of the "process" afforded. *See Chongris,* 811 F.2d at 40–41. Moreover, the proof of the pudding is in the tasting: the process proved effective. The BLS utilized its reconsideration procedure, promptly granted rehearing, withdrew the license revocation, and restored Amsden's license unconditionally. This outcome, unadorned, strongly indicates that the available review mechanisms were constitutionally adequate. *See Chongris,* 811 F.2d at 43. More importantly, perhaps, the outcome belies any claim that defendants should have

known their actions violated Amsden's procedural rights under the Constitution.

Neither the post-deprivation timing of the negotiations and rehearing nor the informality of the process is of such controlling concern that defendants should have known their actions might fall outside the realm of the Constitution. *See Davis,* 468 U.S. at 192–93, 104 S.Ct. at 3018–19; *Mathews,* 424 U.S. at 349, 96 S.Ct. at 909; *Feliciano–Angulo v. Rivera–Cruz,* 858 F.2d 40, 43–44 (1st Cir.1988). Where the integrity of state-licensed professions is concerned, suspensions are permissible without extensive pre-termination process, provided that prompt review is available to resolve contested issues. *See Barry,* 443 U.S. at 64, 99 S.Ct. at 2649. Similarly, we have earlier upheld the sufficiency of post-deprivation notice and hearings concerning a developer's sewer-connection permit (without which the developer's plans were worthless), ruling that "prompt, informal proceedings ... coupled with the judicial review provided by the state courts satisfied the requirements of the due process clause." *Cloutier,* 714 F.2d at 1192. So here: we see nothing in the procedural framework deployed by the BLS that would have indicated to a reasonable official in defendants' position that Amsden was being denied procedural due process.

As a matter of notice or opportunity to defend, then, it is irrelevant to the procedural due process point whether termination of the Amsden–Hunter relationship was demanded by the BLS or offered by Amsden. The material fact is that Amsden was apprised of the BLS's concerns in time to consider his options under the available review procedures and to act effectively thereon. "Having properly pursued the route to redress which [the state] provided ... and having through that avenue secured the restoration of the very property of which [he] had been erroneously deprived, [plaintiff] cannot plausibly claim that [he was] denied the process which was due [him] under the Constitution." *Chongris,* 811 F.2d at 43.[6]

---

**6.** To be sure, *Chongris,* and a number of the other cases cited herein which we believe cut against the merits of plaintiff's claim, were de-

cided after the events here in question. It can therefore be argued that some of these cases fail to reflect the law precisely as understood at the

Defendants' claim to qualified immunity would not be in jeopardy even if we believed that the additional complaints against Hunter were not properly before the BLS, or that, while acting in respect to plaintiff's license, the BLS took into consideration information dehors the record. In arguing to the contrary, appellant seemingly confuses garden variety error with constitutional breach. *Cf., e.g., Newman,* 884 F.2d at 26 ("Even if it ultimately can be shown that the decision ... was arbitrary ... defendants are entitled to immunity from damages so long as they had no reason to know that the evidence on which they relied was faulty."); *Brennan,* 888 F.2d at 192 (similar). *Chongris* illustrates the point. There, board members had considered and relied on the views of an association which under state law lacked standing to participate in the dispute. 811 F.2d at 42. Although the board was "wrong" as a matter of state law to consider that evidence, we were "nevertheless unable to ascribe any constitutional deprivation to the Board's decision." *Id.*

The BLS's unilateral visit to the Whipple property requires no different result. Whether or not good practice, we do not think that this excursion can be said to sink to the level of a constitutional abridgement. In *Chongris,* for example, we found no due process violation where a zoning board viewed premises out of the permit-seeker's presence. *Id.* at 38, 42. Given this circuit precedent, it would be surpassingly difficult to opine that defendants' visit to the Whipple property, without some associated showing (say, that evidence was amassed there which plaintiff was afforded no chance to meet), violated plaintiff's rights. Moreover, it is self-evident from the foregoing that, in our judgment, no reasonable board member would have thought taking a view in appellant's absence transgressed clearly established constitutional principles. *Cf., e.g., Cloutier,* 714 F.2d at 1191 ("Full judicial-type hearings are not required when local boards engage in ... granting

or revoking ... permits."); *Sullivan v. Carignan,* 733 F.2d 8, 9–10 (1st Cir.1984) (per curiam) (similar; state board of accountancy).

At the expense of carting coals to Newcastle, we mention for the sake of completeness that Amsden took yet a further route to redress, hawking his grievances to the BOC. That tribunal heard his diatribe against the procedural deficiencies which he thought infected the BLS hearings. The BOC addressed those issues. To be sure, damages were denied. But, the mere fact that Amsden did not garner an award does not improve his stance before us. To be constitutionally sufficient, state remedies need neither be coterminous with potential federal remedies nor prove successful in the end. As the Court has instructed: "Although the state remedies may not provide ... all the relief which may have been available ... under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1981); *see also Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) (federal-state remedial comparison is not "determinative of the [constitutional] adequacy of the state remedies"); *Chongris,* 811 F.2d at 44–45. What counts is that New Hampshire held out to Amsden, in addition to the BLS's internalized reconsideration mechanism and the availability of direct judicial review, a collateral review process reasonably calculated to address and assuage his grievances.

To sum up, the risk of any lasting erroneous deprivation was miniscule. The panoply of state remedies available to Amsden—and utilized by him—guaranteed the fairness of the state's procedures to a point well above the constitutional minimum. In our view, those procedures were both reasonably effective and reasonably consistent with the imperatives of plaintiff's clearly established constitutional right to be heard

time of the challenged events (the relevant time for purposes of a qualified immunity inquiry). This discrepancy does not help Amsden to any material extent: at most, the prior law was a

little less clear and less obviously in defendants' favor—a situation far short of indicating that defendants were violating plaintiff's "clearly established" rights.

"at a meaningful time and in a meaningful manner." No more was constitutionally exigible. *See Zinermon,* 110 S.Ct. at 983 (a procedural due process "violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process"). It is, therefore, frosting on the cake that, objectively speaking, the defendants were also entitled to qualified immunity on the procedural due process claims.

## C. *Substantive Due Process.*

■ Plaintiff attempts to paint the landscape a shade darker by coloring essentially the same factual predicate with the hues of substantive due process. He asserts that reinstatement of his license was contingent on abandoning Hunter, a *quid pro quo* beyond the reach of the BLS's authority. As such, Amsden urges us to find that the defendants' conduct amounted to such a "misuse of administrative process" that they should have realized Amsden's right to be free from arbitrary government action was imperilled. We are unconvinced.

There is nothing in this record which indicates to us—or which would have indicated to an objectively reasonable official— that defendants' performance crossed the constitutional threshold. Our cases make clear that a regulatory board does not transgress constitutional due process requirements merely by making decisions "for erroneous reasons" or by making "demands which arguably exceed its authority under the relevant state statutes." *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832 n. 9 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *accord Chongris,* 811 F.2d at 42; *Sucesion Suarez v. Gelabert,* 701 F.2d 231, 233 (1st Cir.1983). Even bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations of due process. *See Chongris,* 811 F.2d at 43; *Chiplin Enterprises, Inc. v. City of Lebanon,* 712 F.2d 1524, 1528 (1st Cir.1983); *Roy,* 712 F.2d at 1523; *cf. Collins,* 894 F.2d at 478 n. 6 (on qualified immunity inquiry, "consideration of a government actor's subjective state of mind" irrelevant); *Calamia v. City of New York,* 879 F.2d 1025, 1036

(2d Cir.1989) (similar). By the same token, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis,* 468 U.S. at 194, 104 S.Ct. at 3019; *accord Goyco de Maldonado v. Rivera,* 849 F.2d 683, 687–88 (1st Cir.1988).

To be blunt, we see no point in rehashing plaintiff's animadversions. Charges that substantive due process was denied cannot rest on conclusory allegations or rhetoric alone (even impassioned rhetoric). Were defendants' conduct presented as a matter to be decided on the merits, plaintiff's burden would be to show a due process deprivation of *constitutional* dimension. *See Davis,* 468 U.S. at 194, 104 S.Ct. at 3019. We feel confident that the BLS's treatment of Amsden, as *factually* described, was not so "shocking or violative of universal standards of decency," *Furtado,* 604 F.2d at 95, as to transgress Amsden's federal constitutional rights. Of course, we need not go that far; defendants may ensure safe passage on this appeal merely by showing that, given the state of the law in 1983, reasonable officials would not have known that the actions in question amounted to a deprivation of plaintiff's constitutional rights. On this record, our precedents indisputably support the grant of qualified immunity.

*Creative Environments,* 680 F.2d 822, is precise enough. In that case, the complaint was cast in terms of substantive due process. Plaintiff, a developer, alleged that its proposal had been improperly rejected by the local planning board through an arbitrary misapplication of state law. *Id.* at 831. Nonetheless, we held that the complaint did not allege a constitutional deprivation even if the defendants had in fact misapplied state law. *Id.* at 831–33. In *Chiplin,* we likewise rejected substantive due process claims premised on "arbitrary and malicious official action." 712 F.2d at 1528 n. 6. There, plaintiff alleged it had met all legal requirements for a building permit but that the town "maliciously den[ied] it a building permit for invalid and illegal reasons and in bad faith." *Id.* at 1526. We affirmed a summary disposition, ruling that a "mere bad

faith refusal to follow state law in such local administrative matters simply does not amount to a deprivation of due process where the state courts are available to correct the error." *Id.* at 1528. *See also Cloutier,* 714 F.2d at 1189, 1191 n. 5; *Roy,* 712 F.2d at 1523.

Whether the revocation of Amsden's land surveying license was improperly motivated or insufficiently grounded as a matter of the BLS's jurisdiction is strictly a matter of New Hampshire law. The other issues raised by Amsden anent the BLS's findings, to the extent cognizable at all, are similarly resolvable in state-law terms. We have already limned the state's array of available avenues for review. Given this mise-en-scene, defendants' conduct simply did not possess the depth of imbrutage which might have led responsible public officials to believe their actions crossed "the constitutional line." *Johnson v. Glick,* 481 F.2d at 1033.

## IV. CONCLUSION

Having surveyed the terrain, we discern no wrong of constitutional dimension. There was no way defendants reasonably should have known that their actions, albeit imperfect, implicated, much less violated, Amsden's federal rights. Absent a starker indication of constitutional deficiency, procedural or substantive, summary judgment was properly granted. Especially in the qualified immunity/summary judgment milieu, federal courts have been well advised to steer clear of the potential quagmire inherent in disputes, like this one, which come down to matters of state-law jurisdictional and administrative requirements. *See Davis,* 468 U.S. at 196, 104 S.Ct. at 3020.

At bottom, this appeal exemplifies that section 1983 is not a panacea for every remonstrant disappointed either by his treatment at the hands of a state agency or by the outcome of state administrative proceedings. We need go no further.

*Affirmed.*