David D. FITZGERALD and Cynthia
A. Fitzgerald, d/b/a Kingston
Coach, Plaintiffs,

v.

TOWN OF KINGSTON and Michael
Decapua, Defendants.

No. Civ.A. 96–10666–MEL.

United States District Court,
D. Massachusetts.

June 25, 1998.

John T. Landry, Glynn & Landry, Braintree, MA, for plaintiffs.

Joseph L. Bierwirth, Hemenway & Barnes, Boston, MA, Robert P. Sherman, Joseph C. Marrow, Hutchins, Wheeler & Dittmar, Boston, MA, John J. Davis, Elizabeth M. Fahey, Morrison, Mahoney & Miller, for defendants.

### MEMORANDUM AND ORDER

LASKER, District Judge.

This case arises from former Town of Kingston Police Chief Michael DeCapua's temporary suspension of plaintiff David Fitzgerald's license to operate a taxi cab. Fitzgerald presses two claims under 42 U.S.C. § 1983: first, that DeCapua failed to provide him with notice and a hearing prior to the suspension (Count I), and second, that the process afforded him was constitutionally flawed because it involved an *ex parte* receipt of information about his driving record by the Town's Board of Selectmen (Count III). Fitzgerald also asserts defamation claims stemming from alleged statements by DeCapua related to the suspension and subsequent events (Count II). Finally, Fitzgerald's wife sues DeCapua under state law for intentional interference with contractual relations (Count IV). DeCapua and the Town move for summary judgment on all counts. The motions are granted.

I.

In March and early April, 1993, Fitzgerald and his wife Cynthia owned and operated the Kingston Coach taxi cab business in Kingston, Massachusetts. Each was licensed by the Town of Kingston to operate a taxi. Fitzgerald was also a Town official at the time, serving as Chairman of the Board of Public Health. DeCapua was the Town's Acting Chief of Police.

In late March, 1993, DeCapua was approached by Daniel Sapir, a local reporter. Sapir asked DeCapua whether he was aware of two recent automobile accidents involving Fitzgerald. He also informed DeCapua that he and Fitzgerald were opposing one another in a local political race. DeCapua answered that he had not been aware of the accidents, but would look into them. DeCapua subsequently interviewed both Fitzgerald and the mother of a child injured in the second of the two accidents.

DeCapua's investigation revealed that on March 22, 1993, Fitzgerald had been involved in a motor vehicle accident in Kingston, while he was operating a Kingston Coach taxi. DeCapua also learned the undisputed facts that two days after the accident, on March 24, 1993, in Pembroke, the vehicle Fitzgerald was driving collided with an oncoming vehicle in the other driver's lane, and that several of Fitzgerald's passengers were injured. One passenger, a child, required hospitalization and reconstructive surgery on his face.

DeCapua states that Fitzgerald "indicated" to him during an interview that both of the March accidents were Fitzgerald's fault. Fitzgerald firmly denies either that he accepted responsibility for the accidents, or that he actually was responsible.

Following DeCapua's inquiry of her, the mother of the child who required surgery submitted a written statement to the police detailing the seriousness of her son's injuries. She also reported the "erratic" manner in which Fitzgerald had driven up her driveway when picking up her son just prior to the accident.

On April 6, 1993, upon completion of his investigation, DeCapua notified Fitzgerald by letter that, pursuant to Section 31 of the Town of Kingston Regulations for the Operation of Taxis, he was suspending Fitzgerald's taxi license for a period of 30 days. The letter stated:

This suspension results from the motor vehicle accidents on March 2[2] and March 24, 1993, wherein you were cited or admitted fault on both occasions. Further, the March 24, 1993, accident in Pembroke resulted in treatment or hospitalization of several minors you were transporting. These accidents as well as statements of witnesses describing your driving habits cause me serious concern as to your suitability to drive for hire in Kingston.[1]

Section 31 of the taxi regulations state that "any driver's license granted under the ... regulations may be suspended or revoked by the Chief of Police or by the Board of Selectmen at any time for cause." DeCapua's letter further informed Fitzgerald of his right to appeal the suspension to the Board of Selectmen. Fitzgerald did appeal to the Board, and subsequently appeared, with counsel, at a hearing before the Board on April 20, 1993. At the conclusion of the hearing, the Board voted to take the matter under advisement.

On April 23, 1993, in response to an oral request by Board Chairman Ronald Maribett, DeCapua wrote a letter to Maribett in which he provided what he called a "synopsis of Mr. Fitzgerald's known driving record."[2] DeCapua did not represent that he had searched all available sources of driving record information; he merely reported on "known" incidents. Neither DeCapua nor the Board ever informed Fitzgerald or his attorney that DeCapua had, at Maribett's request, furnished the synopsis.

Fitzgerald complains that he should have had an opportunity before the Board to rebut the assertions made in DeCapua's letter. He contends that the assertions were false, and that had he had a chance, his rebuttal would surely have been effective, considering what

1. DeCapua testified consistently in his deposition, stating that the suspension was "[b]ased on Mr. Fitzgerald's past driving history, his admission of responsibility for the accidents, and the scope and nature of the injuries of the accident with respect to the children."

2. DeCapua's letter provided a cryptic listing of ten incidents and infractions dating from March, 1989, through April, 1993. Apart from the two accidents discussed above, and an April, 1993 report of speeding, discussed below, the list included the following entries: "Failure to Stop—Kingston;" "Speeding—Kingston;" "Verbal Warning (Kingston);" "Violation of DPW regs (Middleborough);" "Accident—Kingston;" "Speeding—Plymouth;" "Accident—no information available (Kingston)."

he claims to be his "real" driving record—a Department of Motor Vehicles "record." The DMV "record" is not at all consistent with the DeCapua letter, and in fact contains considerably fewer entries.

Although Fitzgerald's prospects for rebutting the DeCapua letter are inconsequential (*see* determination below that receipt of the letter was not unconstitutional), because counsel relied so heavily on it at oral argument, it is worth noting that the DMV record in no way raises doubt as to the accuracy of the information DeCapua provided to the Board. Fitzgerald did not file an affidavit or other explanation of the DMV's record-keeping procedures or accuracy. Moreover, the fact that the DMV record fails to note even the March, 1993 accidents diminishes any authority one might be inclined to assign such an agency's records.

On May 3, 1993, the Board informed Fitzgerald that it had found sufficient cause to support DeCapua's 30–day suspension. It further stated that its vote "was based on information provided at [the April 20th hearing]."

\* \* \* \* \* \*

DeCapua acknowledges that on some unspecified date, he told Kimberly Keyes, a reporter for the *Kingston Reporter*, that:

he had suspended Fitzgerald's taxi license for thirty days;

he based the suspension on public safety concerns after conducting an investigation into two recent automobile accidents;

Fitzgerald was cited for the March 24, 1993 accident, on a charge of failure to keep to the right;

at the time of the second accident, Fitzgerald was operating a van which he was driving as a limousine;

an eight-year old boy underwent reconstructive surgery to his face as a result of the second accident;

two days before the second accident, Fitzgerald was involved in a rear-end collision while operating a vehicle registered with the Town as a taxi;

Fitzgerald was not cited for the first accident, but had indicated to DeCapua that he was at fault;

Clive Beasley informed him about the two accidents; and

Daniel Sapir provided additional information to police.

Fitzgerald does not dispute the veracity of what was said to Keyes, except for the statement that Fitzgerald had indicated to DeCapua that he was at fault for the first accident.

The subsequent events concern what Chief DeCapua states that he observed at approximately 7:39 p.m. on the evening of April 7, 1993. According to DeCapua, while traveling in an unmarked police car, he observed what he perceived to be a white male who was short and balding, with grey, fuzzy hair, operating a Kingston Coach taxi. It is undisputed that such a description matches that of Fitzgerald. DeCapua says that at the time he observed the taxi speeding, and promptly clocked it at 45 m.p.h. in a 30 m.p.h. zone.[3] DeCapua then immediately directed a Sergeant Schilling to go to the Fitzgerald home to discuss the speeding. Schilling did so, and met Cynthia Fitzgerald at her door. Mrs. Fitzgerald has blonde hair. She told Schilling that she, rather than her husband, had been driving the car at the time in question. No charges or citations were brought against either husband or wife. At approximately 8:05 p.m., Fitzgerald himself telephoned the police station, and stated, among other things, that he felt he had been harassed and would soon be filing a law suit.

Directly after the above events, DeCapua radioed his observations to the police dispatcher on duty, Susan Macy. He asked Macy to make a record of his observations and the subsequent events—that is, to complete a form known as the "police log." The form, Defendants' Exhibit I, contains a "narrative report" section which DeCapua agrees accurately reflects what he told Macy to include. It also contains a field entitled "incident narrative," which reads "viol. bylaw/ordinance." No one disputes that this means

---

3. Had Fitzgerald been driving with taxi passengers, he would have been violating Town regulations. However, it is agreed that DeCapua observed no passengers in the car on the night of April 7th.

"violation of a by-law or an ordinance." De-Capua denies that he ever directed Macy to make the entry in the "incident narrative" field. He further denies that he told Macy to complete the "action taken" field with the words "departmental action taken," which DeCapua says was undoubtedly a reference to Schilling's brief investigation.

Fitzgerald argues that DeCapua's testimony that he directed the making of the log entry should be Interpreted as an admission that DeCapua specifically told Macy to write the words "viol. bylaw/ordinance" in the "incident narrative" field. The argument is without merit. DeCapua's having directed Macy to complete a log form simply does not give rise to an inference that he told her precisely what to put in every field on the form. Considering both DeCapua's firm denial that he in fact did so, and the particular nature of the disputed fields, there is no reason to doubt that Macy was herself responsible for selecting the language to insert in those fields. Notably, Macy was not deposed by plaintiffs.[4]

DeCapua further acknowledges that at an unspecified time after April 7th, he told *Patriot Ledger* reporter Brendan Farrington that:

he saw Fitzgerald operating the Kingston Coach taxi at 7:40 p.m. on April 7th;

he followed the taxi in an unmarked cruiser;

he clocked the taxi traveling 45 m.p.h. in a 30 m.p.h. zone;

DeCapua did not pull the taxi over because he was reluctant to make stops in an unmarked police vehicle, particularly on Main Street;

he sent an officer to Fitzgerald's residence where the officer spoke to Mrs. Fitzgerald, who informed him that she had been driving the taxi;

DeCapua had no doubt that it was Mr. Fitzgerald driving the vehicle;

he was acting in the interests of public safety; and

he would report the incident to the Town's Board of Selectmen.

■ Plaintiffs allege that DeCapua made additional statements to Farrington, including a statement that "[Fitzgerald] was driving illegally" on the night of April 7th They submitted, however, only a newspaper article by Farrington as support for the allegation. The article is inadmissible hearsay, *see Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993), and thus meaningless on a motion for summary judgment, *see* Fed.R.Civ.P. 56(e).

## II. Due Process

Fitzgerald alleges that the lack of a pre-suspension hearing (Count I), and the *ex parte* receipt of the additional "driving record" information (Count III), violated his procedural due process and substantive due process rights. The defendants do not contest either that they acted under color of state law, or that Fitzgerald's license to operate a taxi constituted a property interest cognizable under the Fourteenth Amendment. The sole issue is whether Fitzgerald was afforded adequate procedural and substantive protection.

■ The essentials of procedural due process are (1) notice of the charges and contentions of the state, and (2) a reasonable opportunity to be heard. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process does not, however, require that notice and a hearing always take place *prior* to the government action, but only that a complainant be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Not surprisingly, what constitutes "meaningful" varies from case to case. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The adequacy of process is deter-

---

**4.** In Kingston, the police log is available to the public, and the "'narrative report" sections of the log are ordinarily republished in one or more local newspapers shortly after entries are made. In this case, the "narrative report" section of the April 7th entry was indeed restated, nearly word-for-word, in a local paper. Although Fitzgerald complains about the paper's publication of the log as if it provides grounds for a separate and independent defamation claim, what the paper published has no significance here—the paper is not a defendant in this action. The only log-related facts properly at issue are those which have to do with DeCapua's statements to Macy.

mined by: (1) the nature of the private and public interests involved; (2) the risk of erroneous deprivation accruing under the procedures used by the state; and (3) the probable benefit of demanding additional procedural safeguards. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Measured by these criteria, Fitzgerald was not entitled to a pre-suspension hearing.

First, Fitzgerald was deprived of his license only for a period of 30 days. The limited duration of the deprivation is significant. A unanimous Supreme Court in *Gilbert v. Homar,* 520 U.S. 594, ——, 117 S.Ct. 1807, 1813, 138 L.Ed.2d 120 (1997), emphasized recently that "in determining what process is due, account must be taken of the length and finality of the deprivation." (internal notations omitted.) Moreover, even during the period of suspension Fitzgerald and his wife maintained ownership of Kingston Coach, and the company continued to operate as usual during the period, with two drivers other than Fitzgerald—one of whom was Mrs. Fitzgerald—taking in the usual fares. The sole result of the suspension was that for one month Fitzgerald himself was unable to contribute personally to the earnings of the company. Furthermore, the suspension had no effect on Fitzgerald's capacity to operate the limousine service that served as another of his sources of income.

On the other hand, the public safety issue facing DeCapua and the Town was undeniably significant. Fitzgerald had been involved in two motor vehicle accidents within a recent three day period. One of the accidents was serious, and resulted in a passenger's requiring hospitalization and reconstructive surgery. Regardless whether Fitzgerald would ultimately be shown to be responsible for the accidents, the frequency and seriousness of the accidents provided reasonable grounds both for DeCapua's concern about Fitzgerald's driving, and for the immediate imposition of a suspension. Considering that the suspension was only for 30 days and did not affect Fitzgerald's income or business operation, the Town's public safety interest here clearly outweighed Fitzgerald's.

The same conclusions apply to the balancing of the risks facing DeCapua when he determined that Fitzgerald's driving warranted action by the Town. The risk of erroneously suspending a taxi driver's license for a 30 days is substantially less worrisome than the risk of not sanctioning the driver when his skills have been seriously put in question. Fitzgerald was not constitutionally entitled to a pre-suspension hearing.[5]

▮ Nor did the receipt by the head of the Board of Selectmen of the "driving record" information violate procedural due process.[6] First, while the *ex parte* receipt of additional information on the subject of the suspension was culpable (even the Town's counsel conceded at oral argument that the omission was not good practice), it did not rise to a constitutional level. "Full judicial-type hearings are not required when local boards engage in ... granting or revoking ... permits," *Cloutier v. Town of Epping,* 714 F.2d 1184, 1191 (1st Cir.1983). Indeed, this precept has been applied in cases, such as this, of the revocation of a professional or occupational license. For example, the First Circuit held in *Amsden v. Moran,* 904 F.2d 748, 756 (1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991), that the state Board of Land Surveyors' unilateral visit to a property which was a subject of ongoing license revocation hearings, did not violate procedural due process, despite the fact that the surveyor never received notice of, or an opportunity to respond to observations gathered at, the visit. The Court stated that "[w]hether or not good practice, ... th[e] excursion [could not] be said to sink to the level of a constitutional abridgement." *Id. See also Chongris*

---

**5.** Fitzgerald argues that the "for cause" language in the local regulation governing license suspension requires a pre-suspension hearing. The authority he cites, however, is inapposite—it concerns the construction of a state statute, rather than the requirements of the Fourteenth Amendment. Moreover, the terms "for cause" and "pre-suspension hearing" are not fungible.

**6.** While this event is complained of primarily in terms of *substantive* due process, it was presented at oral argument also as a *procedural* violation.

*v. Board of Appeals of Andover*, 811 F.2d at 38, 42 (1st Cir.) (no violation where a zoning board took a view of premises at issue out of permit-seeker's presence), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). Particularly in view of the absence of evidence that the full Board ever saw the communication, Fitzgerald's not being afforded an opportunity to rebut DeCapua's report did not violate procedural due process.

Moreover, even if the *ex parte* communication is regarded as a substantial deviation from proper procedure, the judicial relief that was available to Fitzgerald via state law is dispositive of his complaints about that deviation. "When a complainant alleges violations of procedural due process and asserts that those violations are cognizable under section 1983, the existence of state remedies becomes highly relevant." *Amsden*, 904 F.2d at 755. A reviewing court "must ... examine the procedural safeguards built into the statutory or administrative procedure ... and any remedies for erroneous deprivations provided by statute or tort law." *Id.* (internal quotation omitted). The availability of judicial review "is an especially salient consideration where permits and licenses have been denied or revoked by state or local authorities in alleged derogation of procedural due process." *Id.; see also Cloutier*, 714 F.2d at 1191 (citing *Mathews*, 424 U.S. 319, 96 S.Ct. 893)).[7] For Fitzgerald, protection was available by way of the Massachusetts certiorari statute, Mass. Gen. Laws. ch. 249, § 4, which provides for review of a proceeding of an adjudicatory nature resulting in the loss of a license. *See Saxon Coffee Shop, Inc. v. Boston Licensing Bd.*, 380 Mass. 919, 407 N.E.2d 311 (1980). Fitzgerald's failure to exercise his state law rights weighs against allowance of his procedural due process claim.

■ Fitzgerald further argues that the Board's *ex parte* communication violated *substantive* due process by unfairly denying him an opportunity to rebut the information in the letter. As mentioned above, however, the record is devoid of any evidence of actual reliance by the Board on the letter, and the Board itself, in its letter to Fitzgerald,[8] stated that its affirmance of the suspension was based solely on information provided at the hearing. Fitzgerald's substantive due process complaint concerns, therefore, *at most,* the Board's mere *consideration of* the information. Such minimal action, even if it occurred, did not amount to a constitutional violation. The action was not "arbitrary and capricious," nor did it "run counter to the concept of ordered liberty," or, "in context, appear shocking or violative of universal standards of decency." *See Amsden*, 904 F.2d at 753–54. Indeed, the First Circuit has held that denials, suspensions, and revocations of permits or professional licenses, including those involving procedural irregularity, do not ordinarily implicate substantive due process. *See, e.g., Chongris*, 811 F.2d at 42–43. Even bad faith violations of state law or administrative procedures do not always rise to the level of a constitutional deprivation. *Amsden*, 904 F.2d at 757; *Chiplin Enterprises v. City of Lebanon*, 712 F.2d 1524, 1528 (1st Cir.1983).

## III. The Defamation Claims

Fitzgerald complains that on three occasions in early April, 1993, Chief DeCapua made defamatory statements about him with respect to the suspension and the subsequent "speeding" event. None of the statements, however, forms the basis of a valid defamation claim. Each is either unsubstantiated or not defamatory.

■ The first allegedly actionable statement is the entry of the words "viol. by-law/ordinance" in the "incident narrative" field of the police log concerning DeCapua's April 7th observations. As noted above, these words are taken to mean: "violation of a by-law or an ordinance." Fitzgerald's claim as to them is without merit. DeCapua

---

7. Even if a state's post-deprivation remedies might provide less than the relief potentially available under § 1983, "that does not mean that the state remedies are not adequate to satisfy the requirements of due process." *Chongris v. Board of Appeals of Andover*, 811 F.2d 36, 44 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987).

8. Although hearsay, the Board's letter is admissible as a public record under Fed.R.Evid. 803(8).

unconditionally denies having directed Macy to include those words in the log, and plaintiff has submitted no evidence to the contrary. For reasons discussed above, DeCapua's merely having ordered the making of a log entry for the April 7th incident does not give rise to an inference that he uttered the words Macy ultimately typed into that entry.[9] The log entry itself may be admissible as a public record, but the evidence does not support the claim that the allegedly offensive words were DeCapua's.

■ Moreover, even if the "violation" statement were attributable to DeCapua, there is a serious question whether, as a matter of law, the statement is "susceptible to defamatory meaning." *See Foley v. Lowell Sun Publishing Co.*, 404 Mass. 9, 11, 533 N.E.2d 196 (1989). A statement is defamatory if it tends to injure one's reputation in the community or expose one to hatred, ridicule, or contempt, *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853, 330 N.E.2d 161 (1975), and the test is whether the plaintiff is "discredit[ed] ... in the minds of any considerable respectable class of the community," *Mabardi v. Boston Herald–Traveler Corp.*, 347 Mass. 411, 413, 198 N.E.2d 304 (1964). The statement here is not defamatory.

■ Fitzgerald argues that the statement falls within the ambit of the well-settled rule that a false accusation of commission of a crime is defamatory *per se. See Stone*, 367 Mass. at 853, 330 N.E.2d 161. However, the neutral log statement does not qualify as an "accusation." The statement is most reasonably interpreted as merely a nearly contemporaneous recording of police activity and the general type and level of infraction being *investigated.*

Moreover, even if the statement is taken as an accusation, it is not actionable. As an initial point, the conduct raised by the "accusation" is not what Fitzgerald contends it to be. Fitzgerald claims that the statement accuses him not of speeding, which would implicate an ordinance, but of an undisputedly more serious violation of a *by-law* —namely, the by-law prohibiting the driving of a taxi with passengers during suspension. The argument lacks merit because: (1) the log makes no reference whatsoever either to the suspension, or any passengers [10]; (2) speeding is the only questionable conduct mentioned in the log; and (3) Fitzgerald inexplicably reads the word "ordinance" out of the police log.

The only conduct the statement could arguably be construed as "accusing" Fitzgerald of is speeding. Whatever the virtues and requirements of observing speed limits, driving at the rate of 45 m.p.h. in a 30 m.p.h. zone cannot reasonably be regarded as conduct which would "tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *See Stone*, 367 Mass. at 853, 330 N.E.2d 161.

■ Nor is any of the statements by DeCapua to reporter Keyes actionable. The veracity of all but one of the statements goes unchallenged, and those statements are therefore not defamatory. *See McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513 (1988). The only utterance claimed to have been false is DeCapua's admitted statement that Fitzgerald had "indicated [to him] that he was at fault [for the March 22nd accident]." But this statement is not defamatory because, regardless of what Fitzgerald actually told DeCapua, a police officer's report that someone, even a taxi driver, conceded responsibility for a minor car accident in which no one was hurt, cannot reasonably be viewed as seriously discrediting the driver in the eyes of "any considerable and respectable segment in the community." Such a report could in fact be taken as a relatively *positive* reflection of its subject and his honesty.

■ Nor are DeCapua's statements to the reporter, Farrington, actionable. Several of them are not alleged to be false, and, as statements of opinion, do not, as a matter of law, constitute defamatory acts. *See Cole v. Westinghouse Broad. Co., Inc.*, 386 Mass. 303, 309, 435 N.E.2d 1021, *cert. denied*, 459

---

**9.** Macy's testimony, had she been deposed, would likely have shed light on the source of the disputed words.

**10.** As noted above, no passengers were observed.

U.S. 1037, 103 S.Ct. 449, 74 L.Ed.2d 603 (1982). As to the others—most notably, the statement that "[Fitzgerald] was driving illegally," there is no support in the record for the contention that the utterances were ever made. Fitzgerald relies solely on a newspaper article to prove that DeCapua made the disputed statements to Farrington. The article, however, is hearsay, not admissible under any exception to Fed.R.Evid. 802. *See Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir.1993).

*Cynthia Fitzgerald's Claim*

Mrs. Fitzgerald's claim for intentional interference with contractual relations is dismissed because it depends entirely on the allegations of defamation—or, as she puts it, the "false and disparaging" statements by DeCapua—which have been dismissed above.

\*　　\*　　\*　　\*　　\*　　\*

For the foregoing reasons, defendants' Motions for Summary Judgment on Counts I though IV are granted.

It is so ordered.