NATIONAL EDUCATION ASSOCIATION—RHODE ISLAND, by its Secretary, Tia SCIGULINSKY, Rhode Island Federation of Teachers, by its Secretary, Coleen Bielecki, John Callaci, Diana Casey, Edward Casey, Jr., Robert Casey, Bernard Connerton, Richard Deorsey, Ronald Diorio, Denise Felice, Joseph Grande, Gloria Heisler, Karen Comiskey Jenkins, Robert Joy, Janice Lanik, Charlene Lee, Cornelius McAuliffe, Edward Mcelroy Harvey Press, Vincent Santaniello, Joan Silva, Bernard Singleton, Diane Thurber, and Jeanette Wooley, Plaintiffs,

v.

RETIREMENT BOARD OF THE RHODE ISLAND EMPLOYEES' RETIREMENT SYSTEM, Nancy Mayer, Chairperson and Treasurer of the Retirement Board of the Rhode Island Employees' Retirement System in her official capacity, and Joann Flaminio, Executive Director of the Retirement Board of the Rhode Island Employees' Retirement System in her official capacity, Defendants.

Civ. A. No. 94–0389L.

United States District Court,
D. Rhode Island.

Aug. 7, 1997.

Robert H. Chanin, Caroline Frederickson, Bredhoff & Kaiser, Washington, DC, William J. Lynch, Richard A. Skolnik, Skolnik, McIntyre & Tate, Providence, RI, Thomas J. Liguori, Jr., Urso, Liguori & Urso, Westerly, RI, for Plaintiffs.

Marc Gursky, Providence, RI, for Plaintiff–Intervenor Richard DeOrsey.

Alan M. Shoer, Neil F.X. Kelly, Attorney General's Office, Providence, RI, John C. Bartenstein, Theodore M. Hess–Mahan, Ropes & Gray, Boston, MA, Joanne McPhee, William S. Eggeling, Ropes & Gray, Providence, RI, for Defendants.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

In the present case, plaintiffs challenge the constitutionality of R.I. Gen. Laws §§ 36–9.1–1 to –2 (hereinafter the "Eviction Act"). Plaintiffs, employees and organizations that represent employees of the state "for the purposes of collective bargaining," were permitted to elect coverage by the Rhode Island Employees' Retirement System (the "Retirement System") pursuant to R.I. Gen. Laws § 36–9–33 in 1987. Despite the subsequent repeal of that provision, a judge of the Rhode

Island Superior Court upheld plaintiffs' admission into the Retirement System. In 1994, however, the Rhode Island General Assembly (the "General Assembly") passed the Eviction Act, under which plaintiffs' participation in the Retirement System was terminated. Plaintiffs now assert that the Eviction Act, as applied, violates the Contract Clause, the Takings Clause, and the Due Process Clause of the United States Constitution.

The matter is presently before the Court on the parties' cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.[1] For the reasons that follow, plaintiffs' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is granted in part and denied in part.

## I. Facts

In *Nat'l Educ. Ass'n–Rhode Island v. Retirement Bd. of the Rhode Island Employees' Retirement Sys.* ("*NEA–RI*"), 890 F.Supp. 1143 (D.R.I.1995), an opinion denying defendants' motions to dismiss, this Court set forth the background of the present controversy. The following statement recounts those facts, with the addition of all further factual development. The facts are undisputed, except as noted.

In 1936, the General Assembly established the Retirement System. 1936 R.I. Pub. Laws ch. 2334; R.I. Gen. Laws § 36–8–2. State employees, public school teachers, and employees of participating municipalities who otherwise meet the eligibility requirements are able to participate in the Retirement System. *See* R.I. Gen. Laws § 36–9–2 (state

employees); § 16–16–2 (public school teachers); § 45–21–8 (municipal employees). Provisions governing the Retirement System are currently codified in title 36, chapters 8–10 of the General Laws of Rhode Island.

Defendant Retirement Board of the Rhode Island Employees' Retirement System (the "Retirement Board") bears responsibility for the general administration and operation of the Retirement System. *See* R.I. Gen. Laws § 36–8–3. Defendant Nancy J. Mayer, in her capacity as the General Treasurer of Rhode Island, serves as the ex-officio chair of the Retirement Board and as custodian of the funds and treasurer of the Retirement System. *See* R.I. Gen. Laws § 36–8–9.

The Retirement System is a "defined benefit" plan.[2] Therefore, benefits paid to a participating employee are calculated as a percentage, determined by the number of years of credited service, of the average of his or her three highest consecutive years of compensation, multiplied by his or her years of service. *See* R.I. Gen. Laws § 36–10–10. Employees participating in the Retirement System must contribute a fixed percentage to the Retirement System. R.I. Gen. Laws. § 36–10–1.

Pursuant to R.I. Gen. Laws § 36–10–9, participating employees may retire and begin receiving benefits after (a) reaching the age of sixty and completing ten years of service, or (b) completing twenty-eight years of service. Section 36–10–7 of Rhode Island General Laws provides that "it is the intention of the state" to make the required payments in accordance with these provisions.

On July 3, 1987, after repeated attempts to pass similar bills, the General Assembly enacted R.I. Gen. Laws § 36–9–33, which au-

---

1. Plaintiff-intervenor Richard DeOrsey filed his own motion for summary judgment. Since the arguments presented in DeOrsey's memorandum of law parallel the arguments set forth by the other plaintiffs in their collective motion, this Court will refer to plaintiffs' motions for summary judgment as one motion.

2. This differs from a "defined contribution" plan under which the benefits payable to each employee are based directly on the contributions made by or on behalf of that employee, combined with associated investment income. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S.

211, 229–230, 106 S.Ct. 1018, 1028–29, 89 L.Ed.2d 166 (1986) (O'Connor, J., concurring). Under a "defined contribution" plan, benefits paid to an individual are fully funded by the combination of employer and employee contributions. *Id.* By contrast, under a "defined benefit" plan, the contributions paid on behalf of an individual may not fully fund the projected costs of the benefits paid to that particular employee, although the combination of employee contributions and annual state appropriations is calculated to fully fund the Retirement System on an aggregate basis.

thorized certain private-sector employees to participate in the Retirement System. In accordance with § 36–9–33(a), "full-time employees or organizations representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining" were admitted to the Retirement System, provided that coverage was properly elected. In addition, pursuant to R.I. Gen. Laws § 36–9–33(b), such employees were permitted to purchase credit for past years of service as full-time union employees.[3]

Pursuant to § 36–9–33(a), plaintiffs National Education Association—Rhode Island ("NEA–RI") and Rhode Island Federation of Teachers ("RIFT") elected coverage by the Retirement System. In addition, certain union employees, currently the individual plaintiffs in the present action, filed applications with the Retirement Board.

On June 6, 1988, however, the General Assembly repealed § 36–9–33. *See* 1988 Pub. Laws ch. 486 ("Repeal Statute"). At that time, the applications of the individual plaintiffs were pending before the Retirement Board. Based on the repeal of § 36–9–33, the Retirement Board deemed plaintiffs ineligible to participate in the Retirement System, and, therefore, the individual plaintiffs were not allowed to accrue future service credits in the Retirement System or to purchase additional service credits.

On October 20, 1988, NEA–RI, RIFT, and other organizational and individual plaintiffs filed a suit against the Retirement System and the Executive Director of the Retirement Board in Rhode Island Superior Court, claiming that they were entitled to join the Retirement System since they had filed their applications for admission while § 36–9–33 was still in effect. On December 11, 1986, a judge of the Rhode Island Superior Court agreed that the repeal of § 36–9–33 was merely prospective in nature. In addition, on April 23, 1990, the same Superior Court judge, responding to a Petition for Clarification and/or Instructions, held that the individual plaintiffs "shall be treated as becoming members of the Retirement System as of ... January 1, 1990." Neither decision was appealed, and, therefore, the Superior Court judgments became final.

Pursuant to those judgments, the individual plaintiffs were admitted as members of the Retirement System on January 1, 1990. On that date, NEA–RI and RIFT and its affiliates became employers in the Retirement System and were required to contribute to the Retirement System in accordance with § 36–9–33(a). In addition, the individual plaintiffs either began or continued to contribute to the Retirement System and/or purchased past service credits in the Retirement System pursuant to § 36–9–33.[4]

---

3. R.I. Gen. Laws § 36–9–33 provided:
(a) The provisions of chapters 8 through 10 of this title, inclusive, [which establish the terms of the Retirement System,] shall apply to full-time employees or organizations representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining; provided, that any such organization must elect to be covered by the provisions of chapters 8 through 10 of this title by forwarding a certified vote of the organization's appropriate authority to the retirement board not later than December 31, 1988; and provided further, that participation shall not begin later than July 1, 1989. The organization's contribution shall be at the same rate as the contribution of a local education agency for certified teachers. All employees in service as of the date of said certified vote shall become members unless they notify the retirement board, in writing, within sixty (60) days from the date of said certified vote, that they do not wish to become members.

(b) Any member of the state employees retirement system or any full-time employee of an organization representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining, who has prior hereto been a full-time employee of such an organization or who has been employed by any public school district in-state or out-of-state, may purchase credit for such employment. The cost to purchase said credits shall be ten percent (10%) of the employee's first year's earnings as a full time employee of such an organization multiplied by the number of years, and any fraction thereof, of such employment. Provided further, that any such employee who was on official leave of absence from such organization shall be eligible to purchase credits as hereinbefore provided for the period of such leave of absence.

4. Some of the individual plaintiffs were state employees who had been contributing to the Retirement System already.

On June 16, 1991, the General Assembly passed an amendment to the Retirement System providing that "no member shall be eligible for pension benefits ... unless the member shall have been a contributing member of the employee's retirement system for at least ten (10) years." However, the 1991 amendment had a "grandfather" clause, providing that a person who had ten years of service credit as of that date "shall be vested." *See* § 36–10–9(c) (1991).

On July 15, 1994, the General Assembly enacted two identical bills, each entitled "An Act Relating to Public Officers and Employees—Evicting Non–Employee and Non–Teacher Members from the Retirement System," codified as R.I. Gen. Laws §§ 36–9.1–1 to –2 (the "Eviction Act").[5] The Eviction Act provides, in pertinent part:

> [a]ny individual who became a member of the Retirement Systems based solely on § 36–9–33 (repealed), or who purchased credit in the Retirement Systems based upon § 36–9–33 (repealed), shall no longer be entitled to such membership and/or such credit(s) and shall no longer receive any benefits of any type from said Retirement Systems which was based upon § 36–9–33 (repealed).

5. The Eviction Act provides:
 36–9.1–1. Findings
 The General Assembly hereby finds the following: The grant of the opportunity to an individual to purchase, pursuant to Chapter 613 of The Public Laws of 1987, as codified in § 36–9–33 (repealed by PL 88–486), (hereinafter " § 36–9–33, repealed"), credit in, and/or to become a member of the Retirement Systems established under chapter 16 of Title 16, chapter 21 of title 45, and/or chapters 8–10, inclusive of this title ("Retirement Systems") bears no rational relationship to any legitimate governmental purpose. The continued accrual of benefits by the beneficiaries of § 36–9–33 (repealed) and the continued payment of monies under § 36–9–33 (repealed) will cause an invasion of the corpus of the Retirement Systems funds in abrogation of those sections of the Internal Revenue Code of 1986 as amended from time to time which apply to governmental plans (including but not limited to 401(a) and 401(f)), and does not further the purposes behind the Retirement Systems.
 36–9.1–2. Status of non-employee and non-teacher members.
 (a) Any individual who became a member of the Retirement Systems based solely on § 36–9–33 (repealed), or who purchased credit in the Retirement Systems based upon § 36–9–33

When the Eviction Act was enacted, the status of each individual plaintiff was different with respect to the Retirement System. The participation of the individual plaintiffs in the Retirement System is as follows:[6]

## A. *Retirees before July 1994:*

### *Edward Casey, Jr.:*

Edward Casey, Jr. was employed as a field representative and executive secretary for RIFT from March of 1970 to December of 1992. Pursuant to § 36–9–33(b), Casey purchased thirty years and twenty-three days worth of service credit for $28,351.69. He retired in December 1992 at fifty-six years of age.

After his retirement, Casey continued to work for RIFT as a consultant at a rate of one hundred dollars per hour.

### *Bernard Connerton:*

Bernard Connerton worked at NEA–RI from November of 1973 until July 28, 1990. Connerton purchased twenty years, eight months, and twenty-seven days of service credit in the Retirement System for $27,072.88. Pursuant to the early retirement

(repealed), shall no longer be entitled to such membership and/or such credit(s) and shall no longer receive any benefits of any type from said Retirement Systems which was based upon § 36–9–33 (repealed). By January 1, 1995, the Retirement System shall return any contributions or purchases made pursuant to § 36–9–33 (repealed) by said individual and/or said individual's employer, with interest at the actuarially assumed rate earned by the Retirement Systems on its pension funds during the applicable time period since such contributions and/or purchase was made.
(b) Said return of such contributions or purchases shall be offset by any benefits already received by said individual from the retirement system.
(c) Nothing in this chapter shall be construed as prohibiting any individual from later becoming a member of the Retirement Systems or purchasing credits, in accordance with applicable law.

6. The status of the individual plaintiffs is described as of the time that the motion papers in the present matter were filed. In addition, unless otherwise specified, all purchases described below of service credits in the Retirement System were undertaken pursuant to § 36–9–33.

program offered by the state, he retired on July 28, 1990 at the age of fifty-three.

*Richard DeOrsey:*

From July of 1983 until September of 1995, Richard DeOrsey worked as a consultant/administrator for the Independent Association of Employees ("IAE"). From 1974 through 1983, DeOrsey worked for Council 94, an affiliate of the American Federation of State, County, and Municipal Employees. In accordance with § 36–9–33, he filed an application to the Retirement Board which was still pending at the time the General Assembly passed the Repeal Statute. After the decision of the Rhode Island Superior Court, DeOrsey purchased eighteen years and ten months of credit in the Retirement System for $14,440.50.[7] On October 31, 1992, at the age of sixty, DeOrsey retired.

Defendants acknowledge that DeOrsey purchased credits partially for his service at IAE and partially for his service at Council 94. However, they contend that there is neither evidence that DeOrsey was a full-time employee at IAE during the time for which he purchased the service credits, nor evidence that IAE properly elected coverage pursuant to § 36–9–33.

In contrast, DeOrsey maintains that his position as a "consultant/administrator" rendered him a full-time employee at IAE. Moreover, DeOrsey emphasizes that he paid his contribution, as required by § 36–9–33, and IAE made the requisite contribution to the Retirement System on his behalf.

*Ronald DiOrio:*

Ronald DiOrio served as the president of NEA–RI from 1973 until 1985. From October 1988 to February 1989, DiOrio was allegedly re-employed by NEA–RI. In or about August of 1990, DiOrio purchased eleven years, ten months, and seven days of service credits in the Retirement System based on his years of service as the president of NEA–RI. In addition, DiOrio purchased ten years, one month, and one day of service credits pursuant to R.I. Gen. Laws § 36–10–8 for

service he had performed as a public school teacher from 1963 through 1973.

In support of his application to purchase these credits, DiOrio allegedly submitted, or caused to be submitted, a letter from Donald C. Hill, the Executive Director of NEA–RI, stating:

> This is to certify that Ronald L. DiOrio, Social Security # 035–26–3041 returned to our payroll at the National Education Association Rhode Island in October 1988 at an annualized rate of pay of $50,000. He took an unpaid leave of absence to start his consulting firm in February 1989. Mr. DiOrio has resigned his leave effective July 27, 1990.

Pursuant to the 1990 early retirement program, DiOrio retired on July 28, 1990, at the age of fifty.

Defendants allege that Ronald DiOrio is currently under indictment by the State of Rhode Island in connection with his participation in, and purchases from, the Retirement System. More specifically, DiOrio has been charged with providing false statements to an agent of the Retirement System with the intent to wrongly induce the Retirement System to provide him with retirement credits and benefits.

Defendants claim that DiOrio was not eligible to purchase service credits pursuant to § 36–9–33 or to retire under the 1990 early retirement program because he was not an employee of NEA–RI at the time that it elected to participate in the Retirement System and only active members of the state retirement system were eligible to avail themselves of such programs. Moreover, defendants emphasize that DiOrio did not attempt to purchase credits pursuant to § 36–9–33 for his past service as the president of NEA–RI prior to the passage of the Repeal Statute in 1988.

In contrast, plaintiffs claim that DiOrio was entitled to purchase credits in the Retirement System for his past service as a state employee because he was a litigant in

---

7. The calculations of the parties differ as to the amount of service credits purchased by DeOrsey and the purchase price for those credits. However, those differences are of no legal significance for purposes of this opinion.

the successful lawsuit in Rhode Island Superior Court.

*Joseph Grande:*

Joseph Grande was Executive Secretary of the Providence Teachers Union, an entity affiliated with RIFT, from 1968 through 1993. Grande purchased twenty-two years and ten months of credit in the Retirement System for $33,827.36. He retired on June 16, 1993, at the age of sixty.

*Gloria Heisler:*

From 1950 through 1965, Gloria Heisler worked as a secretary for the Rhode Island Institute of Instruction, allegedly a predecessor to NEA–RI. From 1972 to 1990, Heisler was a teacher at South Kingstown Junior High School in Rhode Island. Heisler purchased fourteen years and nine months of service credit for a price of $2241.88. In 1990, at the age of sixty-two, Heisler retired pursuant to the state's early retirement program.

Defendants argue that Heisler's purchase of past service credits was not valid because the organization for which she worked was not an "organization representing employees of the state and/or any political subdivision thereof for the purposes of collective bargaining," as required by § 36–9–33. They contend that public school teachers were not given the right to organize for collective bargaining with their employers until 1966, and, therefore, Heisler's organization could not have had the requisite purpose.

Conversely, plaintiffs maintain that Heisler was in full compliance with § 36–9–33 because the organization for which she was employed is now NEA–RI. In addition, plaintiffs emphasize that teachers were never precluded from collective bargaining, even though there was no statute specifically addressing such activity before 1966.

*Edward McElroy:*

Edward McElroy served as the president of RIFT from 1972 through 1992. McElroy purchased a total of twenty-eight years in the Retirement System for $34,385.50. On November 1, 1992, McElroy retired at fifty-one years of age. Subsequently, McElroy became the Secretary/Treasurer of the American Federation of Teachers at an annual salary of $120,000.

*Bernard Singleton:*

Bernard Singleton was employed by NEA–RI from 1968 through 1989, when he left NEA–RI to take the position of Rhode Island Director of Labor. Singleton purchased a total of twenty-five years, four months, and twenty-eight days of credit in the Retirement System for $25,411.09. He retired on July 28, 1990, at the age of fifty-two, under the 1990 early retirement program.

### B. Retirees after July 1994:

*Janice Lanik:*

Janice Lanik worked at NEA–RI from 1987 to 1994 as a UNISERV Director. Before coming to NEA–RI, Lanik worked as a teacher in the North Smithfield school district and participated in the Retirement System from 1971 through 1987. Lanik purchased one years worth of credit in the Retirement System for a cost of $3,478.28. Her date of birth is March 4, 1939.

In February of 1994, Lanik went on disability leave from NEA–RI due to illness. Prior to the passage of the Eviction Act, Lanik applied to retire based upon her disability, but her application was never processed. She resigned on permanent disability in September of 1995 and has not returned to NEA–RI.

At the time the Eviction Act was passed, Lanik was on disability leave, and she had met the years-in-service requirement, but not the age requirement, for retirement. However, the disability retirement Lanik sought did not have a minimum age requirement. Therefore, plaintiffs contend that Lanik might have been deemed eligible to retire, and would have retired prior to the passage of the Eviction Act, had her application been processed.

*Cornelius McAuliffe:*

Cornelius McAuliffe has worked at a variety of jobs for the State of Rhode Island, NEA–RI, and RIFT. He was employed by RIFT from March 1968 through December of 1969, and he worked for NEA–RI from August 1971 to August of 1973. He pur-

chased four years and eleven months of credit in the Retirement System for $5,096.67. McAuliffe retired on September 14, 1994, at the age of 60.

## C. *Active Employees Eligible to Retire by July 1994:*

### *Robert Casey:*

Robert Casey has been employed as a field representative at RIFT since July of 1974, and he also served as a lobbyist for RIFT from 1975 through 1993 or 1994. Casey purchased twenty-five years of service in the Retirement System for a total of $37,440.67. His date of birth is November 15, 1942.

It is undisputed that Robert Casey had fulfilled both the age and service requirements for retirement by the time the General Assembly passed the Eviction Act.

### *Robert Joy:*

Robert Joy serves as a UNISERV Director at NEA–RI, where he has been employed since 1970. Joy purchased service credits in the Retirement System for thirty years and eight months of past service, at a cost of $33,690.44.

It is uncontested that, at the time the Eviction Act was passed, Robert Joy was eligible for retirement.

### *Harvey Press:*

As of the time the present motions were filed, Harvey Press was the president of NEA–RI, a position he had occupied since 1985. Prior to becoming the president of NEA–RI, Press was a teacher in the North Smithfield school district, where he taught from 1965 to 1985. During that time, Press participated in the Retirement System. Press purchased one year and six months worth of credit in the Retirement System for $6,336.87. His date of birth is March 26, 1943.

It is undisputed that Press was eligible to retire at the time the Eviction Act was passed.

## D. *Active Employees Not Eligible for Retirement by July 1994:*

### *John Callaci:*

John Callaci serves as a field representative for RIFT, where he has been employed since October of 1984. Callaci purchased five years and nine months of service credit in the Retirement System for $16,088.97. He was born on November 28, 1956.

At the time the Eviction Act was passed, Callaci did not have the requisite ten years of service for retirement.

### *Diana Casey:*

At the time the present motions were filed, Diana Casey was employed as a staff representative by RIFT, where she has worked since 1979. Casey purchased slightly over fifteen years and twenty days worth of credit in the Retirement System for $12,952.69. Her date of birth is September 28, 1946.

The parties dispute the exact date of Diana Casey's purchase of service credits and whether her purchase occurred prior to June 16, 1991. As stated above, that date marked the end of the period in which purchased service credits were counted when determining eligibility status for retirement. Therefore, the parties disagree as to whether Diana Casey had fulfilled the service requirement for retirement as of the date the Eviction Act was passed. However, it is undisputed that Diana Casey was not eligible to retire when the Eviction Act was enacted; she was not sixty years old and she did not have twenty-eight years worth of service credit.

### *Denise Felice:*

Denise Felice has been employed with NEA–RI since 1984. In accordance with § 36–9–33, Felice purchased fourteen years, nine months, and seventeen days of service credit in the Retirement System for $16,881.98. Her date of birth is March 11, 1941.

The parties do not dispute that Felice had fulfilled the years-in-service requirement, but not the age requirement, for retirement at the time the Eviction Act was passed.

*Karen Comiskey Jenkins:*

Karen Comiskey Jenkins has been employed with NEA–RI as a public relations director since 1979. Jenkins purchased ten years and ten months of credit in the Retirement System for $13,863.66. Jenkins' date of birth is March 6, 1954.

At the time the Eviction Act was passed, Jenkins had fulfilled only the service requirement for retirement.

*Charlene Lee:*

Charlene Lee has been a full-time employee with RIFT since 1971. Lee purchased nineteen years, five months, and thirteen days in the Retirement System for $9,462.50. Her date of birth is January 12, 1948.

It is undisputed that, at the time the Eviction Act was passed, Lee had neither attained the requisite age nor fulfilled the years-in-service requirement for retirement.

*Vincent Santaniello:*

Vincent Santaniello is currently employed as the Coordinator of Field Services for NEA–RI, where he has been employed since 1975. For the three and a half years before he joined NEA–RI, Santaniello worked with the Rhode Island Department of Education and participated in the Retirement System. In February of 1988, Santaniello left NEA–RI to become a partner in a law firm, but he returned to NEA–RI in 1989. Santaniello purchased twenty years and six months of credit in the Retirement System at a cost of $38,538.64. His date of birth is July 19, 1945.

It is uncontested that, at the time the Eviction Act was passed, Vincent Santaniello met the service requirement, but not the age requirement, for retirement.

*Joan Silva:*

Joan Silva is currently employed at NEA–RI as a coordinator of government relations. Silva bought thirteen years, one month, and twenty-four days of credit in the Retirement System at a cost of $7,090.76. Her date of birth is February 2, 1939.

The parties do not contest that, by the passage of the Eviction Act, Joan Silva had service credits in excess of ten years in the Retirement System, but had not yet reached the age of sixty.

*Diane Thurber:*

Diane Thurber is currently employed as an executive assistant at RIFT, her employer since 1976. Thurber purchased fourteen years of credit in the Retirement System at a cost of $9,707.40. Her date of birth is October 1, 1957.

It is uncontested that Thurber was not eligible to retire when the Eviction Act was passed; she was not yet sixty years of age and she did not have ten years of service credit.

*Jeanette Woolley:*

Jeanette Woolley is currently employed at NEA–RI as a UNISERV Director and has been employed in that capacity since September of 1991. Woolley purchased seventeen years and ten months of credit in the Retirement System for $10,103.70. Her date of birth is June 29, 1947.

When the Eviction Act was passed, Woolley had not yet fulfilled the age and service requirements to qualify for retirement.

In total, the individual plaintiffs contributed an estimated $1,995,784 to the Retirement System. The present value at retirement of their projected pension benefits is estimated to be $11,430,579, and the average projected rate of return for the individual plaintiffs is approximately 1250%.

After the General Assembly passed the Eviction Act, the above plaintiffs filed suit in this Court claiming that the Act violates three provisions of the United States Constitution.[8] First, plaintiffs allege that the Act impairs their contractual rights in violation of the Contract Clause. U.S. Const. Art. I., § 10. Second, plaintiffs contend that the Eviction Act violates notions of substantive due process, in contravention of the Fourteenth Amendment. U.S. Const. amend. XIV. Finally, plaintiffs claim that the termi-

---

**8.** Plaintiffs also filed a motion for a preliminary injunction to prevent the state from refunding plaintiffs' contributions to the Retirement System by January 1, 1995, as required by the Eviction Act. Since the Court granted that motion, no refund will issue until this suit is resolved on its merits.

nation of plaintiffs' participation in the Retirement System constitutes a taking of plaintiffs' private property without just compensation, in violation of the Takings Clause of the Fifth Amendment. U.S. Const. amend. V.

In 1994, defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[9] The essence of defendants' arguments in the motion to dismiss was that no contract had been formed between the plaintiffs and the State of Rhode Island pursuant to § 36–9–33. On July 7, 1995, however, this Court denied those motions, holding that § 36–9–33 created an implied-in-fact contract as a matter of federal law. *See NEA–RI*, 890 F.Supp. 1143.

The decision in *NEA–RI* serves as the starting point for plaintiffs' arguments. Plaintiffs claim that only three issues bearing on Contract Clause analysis remained for further factual development after that opinion was issued: (1) whether the individual plaintiffs had actually relied on the contract created by § 36–9–33; (2) whether the Eviction Act was reasonable and necessary to preserve the Retirement System's status as a tax-exempt government plan; and (3) whether the Eviction Act was reasonable and necessary to correct the unfair results of § 36–9–33. Plaintiffs then argue that they have shown reliance by the individual plaintiffs, and defendants have not shown the Eviction Act to be reasonable and necessary to further either alleged purpose.

Furthermore, plaintiffs maintain that the Eviction Act does not survive rational basis review under the Due Process Clause because the justifications offered by defendants are contrived. Plaintiffs also claim that the Eviction Act violates the Takings Clause because the individual plaintiffs had a property right entitled to constitutional protection that was "taken" for public use.

In contrast, in their motion for summary judgment presently before this Court and in their opposition to plaintiffs' cross-motion for summary judgment, defendants focus on analysis under the Contract Clause. First, defendants argue that in *NEA–RI* this Court merely held that plaintiffs had sufficiently alleged the existence of a contract to survive defendants' motion to dismiss, and further factual development has revealed that no binding contract was created by § 36–9–33. Defendants also maintain that even if this Court were to find that § 36–9–33 created a contract, it was not an enforceable contract. In the alternative, defendants contend that the Eviction Act is constitutional nonetheless because it was reasonable and necessary to further legitimate government interests. More specifically, defendants claim that the Eviction Act was reasonable and necessary to preserve the Retirement System's status as a tax-exempt government plan, to preserve the Retirement System for the benefit of public employees, and/or to correct the error made by the General Assembly when it wrongly allowed the individual plaintiffs to receive benefits that are grossly disproportionate to the contributions they paid into the Retirement System.

In addition, defendants contend that the Eviction Act passes muster under takings analysis because plaintiffs did not have property rights that are compensable under the Takings Clause, the Eviction Act was justified by the need to remedy the unfair effects of § 36–9–33, and the Eviction Act merely terminates plaintiffs' rights to receive windfall benefits, not their contributions into the Retirement System. Finally, based largely on their analysis under the Contract Clause, defendants argue that the Eviction Act passes the rational basis review required by the Due Process Clause.

In so arguing, defendants characterize the 1987 legislation as resulting from a political deal, "conceived and planned by several of the individual plaintiffs who were among the key beneficiaries of the statute's largesse." Arguing that § 36–9–33 was inherently unfair, defendants emphasize that it rendered some individual plaintiffs eligible to receive two pensions and yielded control over the public Retirement System to private employers, affording those employers the opportuni-

**9.** The first motion was filed by defendant Nancy Mayer, in her official capacity as Chairperson and Treasurer of the Retirement Board. The second motion was filed by Joann Flaminio, in her official capacity as Executive Director of the Retirement Board.

ty to affect the pension status of their employees by increasing their salary or allowing certain individuals to return to work after their alleged retirement.

After the parties filed their motions, however, the First Circuit decided *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12 (1st Cir.1996). In *McGrath*, the First Circuit found no violation of the Contract Clause when a municipal employee became ineligible to receive his pension pursuant to a change in the governing statute. In so holding, the First Circuit emphasized both the clause explicitly reserving the state's right to amend the terms of the statute (hereinafter the "reservation clause") and the fact that the employee's right to receive his pension had not yet vested.

At oral argument, which followed the *McGrath* decision, this Court directed the parties to the import of *McGrath* and whether it dictates that "vesting is everything" for purposes of the present case. More specifically, this Court suggested that, based on *McGrath*, an outright gift from the legislature, once conferred, would constitute a cognizable property interest with significance for analysis under the Takings Clause.

In that regard, defendants argue that vesting in *McGrath*, which involved a traditional pension context, is critically different from vesting in the sense of mere statutory eligibility at issue in the present case. Defendants equate vesting with service, and, in the absence of service to the state, they argue that no "true" vesting can occur. Since none of the individual plaintiffs in the present case vested in the "true" sense, defendants argue that their pension benefits may constitutionally be withdrawn.

In contrast, plaintiffs argue that *McGrath* clearly indicates that the individual plaintiffs with vested rights have a property interest in the receipt of those benefits. However, plaintiffs emphasize that the present case, unlike *McGrath*, does not involve a reservation clause. In the absence of such a clause, plaintiffs argue that § 36–9–33 bestowed a contractually enforceable right to receive pension benefits on all of the individual plaintiffs, and the state may not terminate those rights without just compensation.

After hearing oral argument on the cross-motions for summary judgment, the Court took the matter under advisement. The motions are now in order for decision.

## II. Standard for Decision

A motion for summary judgment may be granted pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). A dispute is "genuine" if it "may reasonably be resolved in favor of either party." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994).

The movant has the initial burden of demonstrating that the case presents no genuine issue of material fact which requires resolution by trial. *See Cadle Co. v. John J. Hayes, III*, 116 F.3d 957, 960–61 (1st Cir. 1997). The nonmoving party must then "contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d at 735.

On a motion for summary judgment, the Court must view the record and all reasonable inferences in the light most favorable to the nonmoving party. *See Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991).

## III. Analysis

### A. *The Import of McGrath*

This Court's first opinion in this case, *NEA–RI*, concerned defendants' motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In that opin-

ion, this Court discussed, at length, whether § 36–9–33 established a contract between the State of Rhode Island and the individual plaintiffs, concluding that a contract was formed as a matter of federal constitutional law. Accordingly, this Court concluded that plaintiffs had sufficiently alleged a property interest in their retirement benefits with significance for purposes of the Contract, Due Process and Takings Clauses of the federal constitution.

Since this Court issued *NEA–RI*, however, the legal landscape in the retirement plan context has changed considerably. Most notably, the First Circuit issued *McGrath v. Rhode Island Retirement Bd.*, 88 F.3d 12 (1st Cir.1996). McGrath was a municipal employee who brought suit claiming, *inter alia*, a violation of the Contract Clause when the state deemed him to be ineligible to receive his pension pursuant to an amendment to the governing statute. The First Circuit found no constitutional infraction because McGrath's "pension rights had not yet vested when the modification occurred, and the state had reserved the power to alter or revoke its promise of retirement benefits to municipal employees at the time it established the plan ..." *Id.* at 13.[10]

In so holding, the First Circuit explained that the "evolving legal doctrine" indicates that pension plans "are to be regarded as a species of unilateral contracts," rather than a gratuity bestowed by the state. *McGrath*, 88 F.3d at 16–17. *See also NEA–RI*, 890 F.Supp. at 1153–1155 (describing the various ways in which courts have classified public pension systems). However, the Court expressed ambivalence about construing the pension plan at issue in *McGrath* as a contract, because the relevant statute contained the reservation clause, explicitly reserving the state's right to amend the pension system. *McGrath*, 88 F.3d at 17–18.

The Court then described "the emergent common-law rule" governing private-sector retirement plans with such reservation clauses:

once an employee fulfills the service requirements entitling him or her to retirement benefits under a pension plan, the employee acquires a contractual right to those benefits, and the employer cannot abridge that right despite its aboriginal reservation of a power to effect unilateral amendments or to terminate the plan outright.

*Id.* at 18–19. *McGrath*, however, involved a public-sector, rather than a private-sector, retirement plan, and the First Circuit acknowledged that this difference may be of critical import. Although the Court explained that fairness concerns militate for "comparability of treatment," it noted that it is well-established that statutes do not create contractual commitments "in the absence of an 'unmistakable' intent on the legislature's part to do so." *Id.* at 19 (quoting *United States v. Winstar*, —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (discussing the "unmistakability doctrine")).

Ultimately, the First Circuit explicitly declined to decide whether McGrath was a party to a contract with the state by virtue of his retirement plan. Rather, the Court held:

Assuming, for argument's sake, that such a contract has significance for purposes of the Contract Clause—a matter on which we take no view—it nonetheless is clear that under the contract terms, a member's right to a retirement annuity are not secure until he or she has met the age and service requirements established in the plan (and, therefore, has become vested).

*Id.* at 20.

■ In the wake of *McGrath*, it is clear that, in the view of the First Circuit, no contractually enforceable rights accrue under a public pension plan containing a reservation clause until vesting occurs. Moreover, the First Circuit explicitly defined "vesting" as fulfilling the prerequisites for retirement. *See also Parker v. Wakelin*, 937 F.Supp. 46, 49 (D.Me.1996) (defining "vesting" as referring to the satisfaction of the eligibility requirements for retirement). In the case of

---

**10.** R.I. Gen. Laws § 45–21—47 provides, in pertinent part:

Reserved power to amend or repeal—Vested rights.—The right to amend, alter, or repeal this chapter at any time or from time to time is expressly reserved[.]

McGrath, the Court explicitly noted that McGrath would have had to fulfill both the age and service requirements for retirement in order to be considered "vested." *McGrath,* 88 F.3d at 20.

To be sure, the instant case, unlike *McGrath,* involves private employers. However, this difference does not render *McGrath* less salient for purposes of the present opinion. As explained above, the First Circuit did discuss the potential importance of the public-sector nature of McGrath's plan with respect to the issue of contractual intent. However, the Court never discussed the issue of private, rather than public, employers, and its analysis never depended upon the nature of the employer. Indeed, this difference is not significant for present purposes, because any contractual relationship or transfer of property right presently at issue allegedly occurred between the Retirement System and the individual, not the employer.

Moreover, although the First Circuit only faced McGrath's claim under the Contract Clause, its reasoning was clearly applicable to Takings Clause analysis as well. The First Circuit did not expressly hold that McGrath would have had a contract with the State of Rhode Island after his rights vested, but its reasoning indicated that, at vesting, an individual's right to receive his pension becomes "secure" and that individual has a property right worthy of constitutional protection. In this regard, the Contract Clause has been somewhat of a red herring in this case. Plaintiffs need not have received a contractual right, in particular, in order to merit constitutional protection. Rather, the relevant inquiry is whether plaintiffs have a cognizable property right, whether garnered by contract, gift, or otherwise.

## B. *The Takings Clause*

■ Under the Takings Clause, "private property [may not] be taken for public use, without just compensation." U.S. Const. amend V. It is applicable to the states through the Fourteenth Amendment. *See. e.g. Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). When faced with

a challenge under the Takings Clause, the Supreme Court has considered three factors. First, a court must consider "the character of the action at issue." *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (quoting *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741 (1980)). Second, a court must assess the "economic impact" of the governmental action at issue. *Id.* Finally, a court must consider the action's "interference" with the "reasonable investment-backed expectations" of the private party. *Id.*

■ As will be explained below, under the reasoning of *McGrath,* this Court holds that only individual plaintiffs with vested rights to receive their pension have a "secure" property right protected under the Takings Clause. Therefore, takings analysis is necessarily different for differently-situated individual plaintiffs. This Court concludes that, for the purposes of the present opinion, the individual plaintiffs may be divided into four categories: (1) plaintiffs whose rights had not yet vested when the Eviction Act was passed (hereinafter "non-vested plaintiffs"); (2) plaintiffs with vested rights to their pension benefits who had retired by the time the Eviction Act was enacted (hereinafter "retired plaintiffs with vested rights"); (3) plaintiffs whose rights had vested prior to the passage of the Eviction Act who had not yet retired (hereinafter "active plaintiffs with vested rights"); and (4) plaintiffs whose status with respect to the Retirement System is presently a matter of dispute (hereinafter "remaining plaintiffs").

In categorizing the individual plaintiffs, this Court employs the same approach as the First Circuit in *McGrath.* More specifically, only those individual plaintiffs who had fulfilled the prerequisites for retirement set forth in § 36–10–9(a) by the time the Eviction Act was enacted will be considered to be "vested." Section 36–10–9(a) provides that an individual becomes eligible for retirement upon (a) reaching the age of sixty and completing ten years of service or (b) completing twenty-eight years of service. The fulfillment of these requirements renders an individual fully eligible to retire, and those are

the requirements used by this Court in determining which individual plaintiffs achieved vested status prior to the enactment of the Eviction Act.

In so deciding, this Court rejects plaintiffs' broader definition of "vesting." Relying on § 36-10-9(c) (1991), which stated that individuals who purchased ten years of service credit prior to June 16, 1991 "shall be vested," plaintiffs argue that all individual plaintiffs who had ten years of service credit as of that date are vested, regardless of their age. However, as stated above, that provision is a grandfather clause allowing individuals who already had ten years worth of service credit to use those credits to fulfill the service requirement for retirement, even though only individuals who had actually contributed to the Retirement System for ten years would be eligible for retirement in the future. That provision did not alter the requirements for retirement found in § 36-10-9(a), and, as in *McGrath,* those are the requirements that this Court will consider when considering which plaintiffs are vested.

In addition, this Court rejects defendants' argument that "true" vesting must be equated with service to the state. Quite simply, there is no such thing as "true" vesting and vesting of some lesser sort. The General Assembly, through its established procedures, voted to allow certain private-sector employees to participate in the Retirement System, and, therefore, the prerequisites they must fulfill for retirement are the same as they are for participating public-sector employees.

### (1) *Non-vested plaintiffs*

■ Pursuant to *McGrath,* the non-vested plaintiffs did not have a property interest in their pension plan with significance for purposes of the Takings Clause. The situation of the non-vested plaintiffs with respect to the Retirement System is analogous to that of McGrath. Their right to receive their pension benefits was contingent upon the fulfillment of the prerequisites for retirement, and, as the First Circuit held, such rights are not "secure" prior to vesting.

Plaintiffs argue, however, that because the provision at issue in the present case does not contain an explicit reservation clause, even the non-vested plaintiffs have enforceable property rights. In contrast, defendants argue that § 36-10-7, a provision referring to the state's "intention" to fulfill the obligations of the Retirement System, is the functional equivalent of the reservation clause at issue in *McGrath.*

This Court concludes that § 36-10-7 is not the "functional equivalent" of the explicit reservation clause in *McGrath.* However, even in the absence of such a clause, it is abundantly clear that the State may amend the provisions of the Retirement System at any time (provided, of course, that just compensation is paid for any private property taken for public use). As the Supreme Court of Rhode Island has noted, "[p]ublic pensions have always been a heavily regulated legal arena. Therefore, individual expectations of immunity from future statutory change [are] unwarranted even if [such] provisions [are] contractual in nature." *Retired Adjunct Professors of the State of Rhode Island v. Almond,* 690 A.2d 1342 (R.I.1997)(holding that it was constitutionally permissible for the General Assembly to enact a law which altered the number of hours retired professors may work before losing their eligibility to receive their pension). Since the General Assembly could alter the Retirement System even without explicitly reserving its right to do so, there is no basis for holding that the non-vested plaintiffs have a "secure" right in the receipt of their pension benefits.[11]

■ This conclusion ends the takings inquiry, for, in the absence of a secure property right, there can be no "taking of private

---

11. In *McGrath,* the First Circuit noted that the argument that a state legislature may always amend its pension plan, even without an explicit reservation clause, "may be too simplistic" because "[a]n explicit reservation easily can be understood as a legislative effort to avoid creating a contractual obligation ..." *McGrath,* 88 F.3d at 17, n. 6. Although this note of caution strengthens the argument that a statute with an explicit reservation clause will not create a binding contract, it does not indicate that statutes without such clauses create contractual rights. As the First Circuit recognized in *McGrath,* there are many obstacles to finding such commitments in legislative enactments. *Id.* at 19.

property for public use." *See Pro–Eco, Inc. v. Bd. of Comm'rs of Jay County, Indiana,* 57 F.3d 505, 510 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 672, 133 L.Ed.2d 522 (1995) ("the Board did not 'interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute "property" for Fifth Amendment [Takings Clause] purposes' ") (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978)). *But see Parker v. Wakelin,* 937 F.Supp. 46, 58, at n. 20 (D.Me. 1996) (assuming, without deciding, that non-vested plaintiffs had a property interest in the receipt of their pension benefits).

■ Therefore, the Eviction Act, as applied to the non-vested plaintiffs, passes muster under the Takings Clause. As the factual development in the present case reveals, the non-vested plaintiffs are John Callaci, Diana Casey, Denise Felice, Karen Comiskey Jenkins, Janice Lanik, Charlene Lee, Cornelius McAuliffe, Vincent Santaniello, Joan Silva, Diane Thurber, and Jeanette Woolley. Those individual plaintiffs had not yet fulfilled the age and service requirements for retirement when the Eviction Act was passed. Although Janice Lanik and Cornelius McAuliffe are presently retired, they retired only after the Eviction Act was enacted and were not vested at the time of the Act's passage. *See, e.g., Pro–Eco, Inc, v. Bd. of Comm'rs of Jay County, Indiana,* 57 F.3d at 509 ("the relevant inquiry" for purposes of takings analysis is "whether the claimant had a recognized property interest at the time the government entity acted").

### (2) *Retired plaintiffs with vested rights*

The First Circuit did not expressly hold that McGrath would have had an enforceable property right if his rights had vested before the statutory change was implemented. However, the First Circuit's reasoning clearly indicates that retired plaintiffs with vested rights have a property right with significance for purposes of the Takings Clause. Indeed, the First Circuit expressed ambivalence concerning whether McGrath had a contract with the State of Rhode Island, but indicated that McGrath's right would become "secure"

after vesting. *See McGrath,* 88 F.3d at 20. Furthermore, the absence of a reservation clause, if it has any effect, can only strengthen the retired plaintiffs' interest in their retirement benefits.

Since this Court holds that the retired plaintiffs with vested rights do have a property right in the receipt of their retirement annuity, this Court must evaluate the Eviction Act under the three prongs of the takings analysis. First, as this Court recognized in *NEA–RI,* "[t]he [Eviction] Act totally extinguishes all of the retirement benefits that the individual plaintiffs acquired pursuant to § 36–9–33 and upon which they have relied for four years." *Id.* at 1162 (discussing whether the Eviction Act substantially impairs the contractual relationship between the individual plaintiffs and the Retirement System). Second, in terminating these plaintiffs' rights to receive their pension, the Eviction Act interferes with such plaintiffs' "reasonable investment-backed expectations." Indeed, pursuant to § 36–9–33, the retired plaintiffs with vested rights had contributed to the Retirement System, received payments in accordance with their pension plan, and reasonably expected such payments to continue.

Defendants, however, argue that the effects of the Eviction Act are not severe enough to constitute a taking because the Act merely terminates plaintiffs' rights to receive "windfall benefits." Relying on *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979) for the proposition that the loss of future profits does not constitute a taking, defendants make a weak attempt to separate plaintiffs' interest in their pension plan into three components: (1) plaintiffs' contributions to the Retirement System; (2) the accrued interest on those contributions, and (3) the purported "windfall benefit" comprising the rest of the pension to be received by plaintiffs.

■ This Court disagrees. In so arguing, defendants ignore the very essence of a pension plan—the payment of money in return for the security of receiving a future stream of payments. As such, a pension plan may not be divided into separate components.

Since the Eviction Act only provides for the return of plaintiffs' contributions with interest, it completely terminates plaintiffs' rights to receive a pension, and that action is sufficiently severe to constitute a taking.

Similarly, defendants' argument that the individual plaintiffs could not have "reasonably" expected to receive pensions pursuant to § 36–9–33 because those pensions were grossly disproportionate to their contributions is misplaced. In so arguing, defendants misapprehend the term "reasonable" in the context of a takings inquiry. The individual plaintiffs' expectation of receiving their benefits was "reasonable," because that is what § 36–9–33 and the provisions of the Retirement System guaranteed them. Perhaps the return on plaintiffs' contributions was unwise in terms of fiscal planning, but, once enacted, § 36–9–33 had the force of law, and plaintiffs were reasonable in relying on its provisions.

Finally, defendants' argument that the Eviction Act does not transgress the Takings Clause because it was reasonable and necessary to correct the unfair effects of § 36–9–33 is of no moment. Quite simply, this is not the law. In so arguing, defendants ignore the basis for the Takings Clause: if the government must take private property for public use, as defendants argue was the case here, just compensation must be paid.

In this regard, this Court holds that the return of the retired plaintiffs' contributions with interest does not constitute just compensation. As explained above, the interest of these plaintiffs in receiving their pensions is greater than the value of their contributions. Accordingly, as just compensation, each retired plaintiff with vested rights is entitled to receive the full actuarial value of his or her share in the pension system.

As the facts of the present matter indicate, the retired plaintiffs with vested rights are Edward Casey, Jr., Bernard Connerton, Joseph Grande, Edward McElroy, and Bernard Singleton. Some of these plaintiffs had retired pursuant to an early retirement scheme, and, therefore, they did not have to attain the age of sixty in order to retire. However, they are still legally vested plaintiffs, as determined by the State of Rhode Island and its early retirement plan, and

their right to receive their pension was a cognizable property right.

### (3) Active plaintiffs with vested rights

In *McGrath*, the First Circuit explicitly declined to address the rights of active, as opposed to retired, employees whose rights to receive a retirement annuity had vested:

> It is unclear whether the legislature can pass and lawfully enforce an amendment that adversely affects an individual who has satisfied the age and years-in-service requirement but has not yet retired. This case does not present an appropriate occasion for us to explore this *terra incognito.*

*McGrath*, 88 F.3d at 20, n. 9. However, the reasoning of *McGrath* indicates that active plaintiffs with vested rights have a property interest in their pension benefits that is significant for purposes of the Takings Clause.

In *McGrath*, the First Circuit equated vesting with fulfillment of the requirements for retirement. The Court, however, never mentioned retirement as a requirement for vesting, nor did it emphasize the actual receipt of pension payments as playing a role in its decision. Moreover, as is the case with retired plaintiffs, once an individual's right to receive a pension has vested, that individual has a reasonable investment-backed expectation of receiving the benefits. Indeed, that individual can retire and begin receiving a pension at any time.

■ Therefore, there is no principled way to distinguish retired plaintiffs with vested rights from active plaintiffs with vested rights. For purposes of the Takings Clause, this is a distinction without a difference. For the foregoing reasons, this Court holds that the Eviction Act, as applied to plaintiffs Robert Casey, Robert Joy, and Harvey Press, is unconstitutional under the Takings Clause, and, therefore, they are entitled to just compensation on the same basis as retired plaintiffs with vested rights.

### (4) Remaining plaintiffs

There are three remaining plaintiffs whose status with respect to the Retirement System is presently a matter of dispute. Those individuals are Richard DeOrsey, Ronald DiOrio,

and Gloria Heisler. Defendants contend that these plaintiffs are not eligible to participate in the Retirement System for the following reasons. First, defendants claim that the entity for which Richard DeOrsey worked did not enter the Retirement System legally, and DeOrsey was not a full-time employee of that organization at the time it began to contribute to the Retirement System. Second, defendants claim that Ronald DiOrio, one of the plaintiffs who was allegedly responsible for lobbying the General Assembly concerning § 36–9–33, was not an employee of NEA–RI at the time it elected to participate in the Retirement System. Finally, defendants argue that Gloria Heisler worked for a corporation that was not covered by § 36–9–33, because it was not an organization "for the purpose of collective bargaining." In contrast, plaintiffs maintain that these three plaintiffs were in full compliance with § 36–9–33 and were properly admitted into the Retirement System.

In addition, plaintiffs argue that the eligibility status of these three individuals is not properly before this Court. They contend that the Retirement Board already deemed these plaintiffs to be eligible to participate in the Retirement System, and, in any event, there are proper administrative channels for such re-evaluations. Citing *Perrotti v. Solomon*, 657 A.2d 1045 (R.I.1995) for the proposition that the Retirement Board has the authority to render pension eligibility determinations and to re-evaluate such determinations, plaintiffs argue that this Court should not address these individual cases.

 This Court does not dispute the authority of the Retirement Board to render such decisions. However, the authority of the Retirement Board and the authority of this Court are not mutually exclusive; the Retirement Board may have the authority to render such decisions, but that does not preclude this Court from exercising its own authority. Moreover, this Court must determine whether these individuals became *legally* vested, for it must weigh the constitutionality of the Eviction Act as applied to the individual plaintiffs. Indeed, as explained above, the determination of whether a particular plaintiff has a property right

rests upon whether his or her right to receive a pension has legally vested. As defendants cogently argue, if this suit were brought by one plaintiff who was found to have entered the Retirement System illegally, that issue would be relevant to his constitutional claims. This result does not change merely because there are multiple plaintiffs. Therefore, the status of all plaintiffs must be clear for proper disposition of this case.

 At the present time, there are questions of fact concerning whether these three plaintiffs are *legally* vested, and such factual disputes may not be properly resolved on a motion for summary judgment. Accordingly, the cross-motions for summary judgment are denied as to Richard DeOrsey, Ronald DiOrio, and Gloria Heisler.

### C. The Contract Clause

The Contract Clause prohibits states from passing "any ... Law impairing the Obligation of Contracts ..." U.S. Const. Art. 1, § 10. Although the Contract Clause has routinely been applied to contracts between states and private parties, *see. e.g., Fletcher v. Peck*, 6 Cranch 87, 10 U.S. 87, 137–139, 3 L.Ed. 162 (1810), its mandate "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238–39, 78 L.Ed. 413 (1934)).

 As this Court explained in *NEA–RI*, in determining whether a state law violates the Contract Clause, courts perform a three-part analysis. *NEA–RI*, 890 F.Supp. at 1151. First, a court "must decide whether the challenged law infringes a right that arises from a contract or a 'contractual agreement.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985)). If a court concludes that the law at issue impairs a contractual right, it must then consider whether the impairment is substantial in nature. *NEA–RI*,

890 F.Supp. at 1151. A challenged law may nonetheless survive scrutiny under the Contract Clause if "the impairment is 'reasonable and necessary to serve an important public purpose.'" *Id.* (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977)).

■ The parties have submitted lengthy memoranda addressing all issues relevant to the Contract Clause. However, pursuant to *McGrath,* the Contract Clause claim of the non-vested plaintiffs fails on the first prong of the requisite analysis.[12] As stated above, in *McGrath,* the First Circuit held that even if § 36-9-33 created a contract with significance for purposes of the Contract Clause, no rights accrued under that arrangement until the individual's rights to receive a pension vested. Therefore, the non-vested plaintiffs did not have an enforceable contractual arrangement with the state at the time the Eviction Act was passed. *See Parker v. Wakelin,* 937 F.Supp. 46 (D.Me.1996) (holding that the statute governing a public pension plan created a contract between the State of Maine and vested plaintiffs, but not between the State of Maine and non-vested plaintiffs).

This conclusion is not altered merely because the statute presently at issue does not contain an explicit reservation clause. In *McGrath,* the First Circuit explained that a reservation clause may render illusory any potential contract created between the employees and the state pursuant to the provisions of the Retirement System. However, as explained above, it is well-established that the General Assembly may alter the Retirement System, and the First Circuit in *McGrath* clearly divided those individuals who have a "secure" right that may not be taken, from those who do not, at the point of vesting. Accordingly, even in the absence of a reservation clause, the non-vested plaintiffs did not have an enforceable contract right with the State of Rhode Island pursuant to § 36-9-33.

**D.** *The Due Process Clause*

■ There are two types of due process claims. Procedural due process notions prohibit the use of procedures that are constitutionally inadequate, while the "substantive component" of the Due Process Clause "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986)). As the First Circuit has explained, "[a]s distinguished from its procedural cousin, then, a substantive due process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the government did it." *Amsden v. Moran,* 904 F.2d 748, 754 (1st Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).

In the present case, the non-vested plaintiffs proceed under a theory of substantive due process, arguing that their prospective retirement benefits were "property interests that are entitled to protection from arbitrary state action." *NEA–RI,* 890 F.Supp. at 1164. Defendants, however, contend that the Eviction Act passes the requisite rational basis review because it was reasonable and necessary to preserve the legitimate state purposes of preserving the Retirement System's status as a tax-exempt government plan and correcting the unfair effects of § 36-9-33.

■ To succeed in their substantive due process claim, the non-vested plaintiffs must prove that they had a property interest in their future retirement benefits. In addition, those plaintiffs must show that the Eviction Act which deprived them of those benefits was not "rationally related to a legitimate state purpose." *Parker v. Wakelin,* 937 F.Supp. 46, 58 (D.Me.1996). *See also Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). The First Circuit has recognized that, "before a constitutional infringement occurs, state action must *in and of itself* be

12. This Court's resolution of the claims of the vested plaintiffs under the Takings Clause renders it unnecessary to consider the claims of the vested plaintiffs under the Contract or Due Process Clauses. Moreover, a determination as to the status of the remaining plaintiffs awaits further proceedings. Therefore, the following inquiry need only apply to the non-vested plaintiffs.

egregiously unacceptable, outrageous, or conscience-shocking." *Amsden v. Moran,* 904 F.2d at 754.

■ This Court need not explore the reasons for the passage of the Eviction Act, for *McGrath* dictates that the non-vested plaintiffs do not have a cognizable property interest in the receipt of their pension benefits. In *NEA–RI,* in analyzing plaintiffs' due process claim, this Court stated that "[i]n order to prove a property interest, plaintiffs must have 'alleged a tangible interest in [their pension benefits] sufficient to invoke the general constitutional protection against arbitrary and irrational government action.'" *NEA–RI,* 890 F.Supp. at 1164 (quoting *Hoffman v. City of Warwick,* 909 F.2d 608, 618 (1st Cir.1990)). This Court then concluded that plaintiffs had alleged the requisite "tangible interest" because they had a "reasonable expectation of receiving a pension benefit." *NEA–RI,* 890 F.Supp. at 1164. However, as stated above, the First Circuit in *McGrath* explicitly held that McGrath did not have a "secure" right to receive his retirement annuity for purposes of analysis under the Contract Clause before his right to receive such an annuity vested. This reasoning bears on the present due process inquiry as well. Pursuant to *McGrath,* any interest the non-vested plaintiffs have in the receipt of their pension benefits is not a "secure" one and does not merit constitutional protection. As applied to the non-vested plaintiffs, therefore, the Eviction Act does not transgress the Due Process Clause of the Fourteenth Amendment.[13]

This Court is mindful that the First Circuit has embraced a somewhat broader definition of property for purposes of substantive due process. For example, in *Hoffman v. City of Warwick,* 909 F.2d 608, 618 (1st Cir.1990), the First Circuit stated:

Although the Repeal Statute did not deprive plaintiffs of a compensable property right, plaintiffs have alleged a tangible interest in the seniority benefits [at issue] sufficient to invoke the general constitu-

tional protection against arbitrary and irrational governmental action.

Moreover, in *McGrath,* the First Circuit only entertained McGrath's claim under the Contract Clause. However, even assuming that the non-vested plaintiffs had an interest in their pension benefits that was significant for purposes of substantive due process, the Eviction Act, as applied to the non-vested plaintiffs, nevertheless survives a substantive due process challenge, because there is nothing arbitrary or irrational about evicting non-vested, private employees from a public pension system.

As a final note, this Court was undeterred by defendants' argument that enforcing § 36–9–33 would violate public policy. In this regard, defendants' reliance on *Driscoll v. Burlington–Bristol Bridge Co.,* 8 N.J. 433, 86 A.2d 201 , *cert. denied,* 344 U.S. 838, 73 S.Ct. 25, 33, 34, 97 L.Ed. 652 (1952) is misplaced. In *Driscoll,* the Supreme Court of New Jersey voided the purchase of two bridges by the Burlington County Bridge Commission because the purchase was "fraught with fraud and corruption." *Id.,* 86 A.2d at 221. In addition to the fact that *Driscoll* is, quite obviously, not binding on this Court, it is entirely distinguishable on its facts. Indeed, *Driscoll* involved a situation in which:

[b]y 11:30 a.m., less than an hour from the time their meeting had commenced, the bridge commissioners [who had been appointed that morning] had organized and put through a $12,000,000 transaction of which they were totally ignorant only 18 hours before and about which they had no information or advice other than that furnished them by the sellers.

*Id.,* 86 A.2d at 216. In defendants' lengthy chronicle of § 36–9–33's passage, they do not allege the extensive corruption addressed in *Driscoll.* Some of the individual plaintiffs may have engaged in extensive lobbying of the General Assembly in connection with the passage of § 36–9–33, as defendants allege, but the fact remains that § 36–9–33 was

---

**13.** It should be clear by now that the absence of a reservation clause in the present case does not alter this conclusion.

passed in accordance with the established procedures of the General Assembly.

This Court acknowledges that many of defendants' arguments are essentially attacks on the legitimacy of § 36–9–33. However, this Court's disposition of this matter does not rest upon an appraisal of the fairness (or lack thereof) of § 36–9–33. That provision may have been unwise, but once passed by the General Assembly in accordance with its rules, § 36–9–33 had legal significance. As plaintiffs argue, to the extent that defendants focus on the gross injustice of § 36–9–33, they merely argue for legislative reform, because such arguments are simply not relevant to the question at hand. The sole issue before this Court is whether § 36–9–33, whether wise or unwise, gave individual plaintiffs rights to receive retirement annuities which are worthy of constitutional protection.

■ The long and short of it is that the Eviction Act is unconstitutional as applied to all legally vested plaintiffs and is constitutional as applied to non-vested plaintiffs. Accordingly, the vested plaintiffs cannot be expelled from the Retirement System and the non-vested plaintiffs can. Therefore, the non-vested plaintiffs are entitled to receive a refund with interest for the contributions they paid into the Retirement System and plaintiffs NEA and RIFT are entitled to such a refund for what they contributed on behalf of the non-vested plaintiffs.

## IV. Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is granted in part and denied in part, and defendants' motion for summary judgment is granted in part and denied in part. More specifically, plaintiffs' motion is granted as to plaintiffs Edward Casey, Jr., Robert Casey, Bernard Connerton, Joseph Grande, Robert Joy, Edward McElroy, Harvey Press, and Bernard Singleton, and those plaintiffs shall continue to participate in the Retirement System as they did prior to the passage of the Eviction Act or just compensation must be paid to them. Defendants' motion for summary judgment is granted as to plaintiffs John Callaci, Diana Casey, Denise Felice, Karen

Comiskey Jenkins, Janice Lanik, Charlene Lee, Cornelius McAuliffe, Vincent Santaniello, Joan Silva, Diane Thurber, and Jeanette Woolley and they may be evicted from the Retirement System. The cross-motions for summary judgment are denied with respect to plaintiffs Richard DeOrsey, Ronald L. DiOrio, and Gloria Heisler. A bench trial on the merits will be scheduled as to those three plaintiffs to determine if they legally vested.

Since the First Circuit abhors piecemeal appeals, *see. e.g., Consol. Rail Corp. v. Fore River Ry. Co.,* 861 F.2d 322, 325 (1st Cir. 1988), no judgments will enter until all claims are resolved.

It is so ordered.

